

April 8, 2024

**VIA ELECTRONIC MAIL**
Louis Antonacci
louantonacci@gmail.com

**Subject: Final Response for FOIA Request No. 2024-FOIA-04828**

Dear Louis Antonacci:

The Department of Licensing and Consumer Protection (DLCP) is in receipt of your request pursuant to the District of Columbia Freedom of Information Act (FOIA). Specifically, you requested:

> Louis B. Antonacci vs BEAN LLC - Initial File Number L53032-- CASE # 1:24-CV-00172
>
> Please send me your record of what documents were served on the servee, BEAN LLC, in this matter.
> (Date Range for Record Search: From 03/05/2024 To 03/13/2024)

Your request is granted. DLCP's Corporations Division searched its records and found the attached records responsive to your request.

**Appeal Rights**

Pursuant to D.C. Code § 2-537 and Title 1 of the D.C. Municipal Regulations (DCMR) § 412, you may file an administrative appeal or seek judicial review if you are dissatisfied with a public body's response to your request. Administrative appeals are submitted to the Mayor.  If you submitted your FOIA request via the Freedom of Information Act Public Access Website, you may submit the appeal by logging on to your account via FOIAXpress.  An appeal also may be submitted by mail or email.  The appeal must include a copy of the original request as well as a copy of the public body's written denial letter issued to you, if any. In addition, the appeal must include a written statement of the arguments, circumstances, or reasons in support of the information sought by your request. The appeal letter must include "Freedom of Information Act Appeal" or "FOIA Appeal" in the subject line of the letter as well as marked on the outside of the envelope. You may direct a written appeal to:

foia.appeals@dc.gov

Or

The Mayor's Office of Legal Counsel
FOIA Appeal
1350 Pennsylvania Ave., N.W.
Suite 407
Washington, D.C. 20004

A copy of all appeal materials must be forwarded to Jessica Darby, D.C. Department of Licensing and Consumer Protection, 1100 4th Street, S.W., 3rd Floor, Washington, D.C. 20024.

 1100 4th Street SW, Washington, DC 20024 | dlcp.dc.gov | 202.671.4500



Please feel free to contact me if you have any questions regarding this response.

Sincerely,

*Jessica Darby*

**Jessica Darby** | *Government Information Specialist, The Office of General Counsel,*
The Department of Licensing and Consumer Protection
jessica.darby@dc.gov | 1100 4th St SW, DC 20024
main: 202.671.4500 || cell: 202.445.9214
dlcp.dc.gov



## District of Columbia Government
### Corporations Division

**Form SP-1.** Ver. 5, October, 2022
**Service of Process Action Form**

| | |
|---|---|
| **Entity Name:** | LOUIS B. ANTONACCI VS BEAN LLC D/B/A/FUSION GPS |
| **Entity Address:** | 4115 MILITARY ROAD, NW - WASHNGTON, DC 20015 |
| **Date of Service:** | 3/8/2024 |

**Type of Service:**

☐ Demand   ☐ Trial   ☑ Legal Notice   ☐ Subpoena
☑ Other

**Subject:** GN6/SUMMONS IN A CIVIL ACTION/AFFIDAVIT OF NONSERVICE/COMPLAINT-CASE # 1:24-CV-00172

Dear Customer,

Service was made upon the Superintendent of Corporations for the Department of Licensing and Consumer Protection, for the District of Columbia on the following date    3/8/24    and this copy is forwarded to you by certified mail in accordance with the Code of Laws for the District of Columbia.

If you have any questions, please contact the Court or Attorney for the Plaintiff.

*Rebecca Janovich*

REBECCA JANOVICH
Deputy Superintendent of Corporations,
Corporations Division

GOVERNMENT OF THE DISTRICT OF COLUMBIA
MURIEL BOWSER, MAYOR



Reset Form

**GOVERNMENT OF THE
DISTRICT OF COLUMBIA
MURIEL BOWSER, MAYOR**

## District of Columbia Government

### Corporations Division

### Service of Process Action Form.
### Form GN-6, Ver. 5, September 2023

This form can only be used to serve the defendant – domestic or foreign filing entity if plaintiff or his representative have exhausted all the means to serve domestic or foreign filing entity as prescribed under D.C. Code § 29-104.12

| ENTITY TYPE / AUTHORITY | FILING FEE |
|---|---|
| Domestic or Foreign Filing Entity: § 29–104.12. | Refer to Corporate Fee Schedule posted online; |

Under the provisions of the Title 29 of D.C. Code (Business Organizations Act), the plaintiff identified below is serving the defending domestic or foreign filing entity and for that purpose submits the statement below.

1. Plaintiff's Name

# Louis B. Antonacci

2. Plaintiff's Address

# 501 Holland Lane, Unit 501, Alexanndria, VA 22314

3. Defending Domestic or Foreign Filing Entity's Name (give file# if known)

# BEAN LLC d/b/a Fusion GPS (File No. L53032)

4. Defending Domestic or Foreign Filing Entity's Address

# 4115 Military Rd. NW, Washington, DC 20015

5. One of the following conditions applies (must select one)

☐ Represented entity failed to appoint or maintain a registered agent in the District; or

☑ A represented entity's registered agent in the District cannot with reasonable diligence be found.

6. Duplicate copies of the process, notice, or demand are submitted along with this form.

If you sign this form you agree that anyone who makes a false statement can be punished by criminal penalties of a fine up to $1000, imprisonment up to 180 days, or both, under DCOC § 22-2405;

7. Name of the Plaintiff or Authorized Person

Louis B. Antonacci

7A. Signature of the Plaintiff or Authorized Person

Mail all forms and required payment to:
Department of Licensing and Consumer Protection
Corporations Division
PO Box 712300
Philadelphia, PA 19171-2300
Phone: (202) 442-4432

Many corporate filings are available online.

Go to our CorpOnline site at **https://corponline.dlcp.dc.gov** and sign in with Access DC to proceed.

Online filings are paid by credit card.

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

| | | |
|---|---|---|
| Louis B. Antonacci | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No.  1:24-cv-00172 |
| Rahm Israel Emanuel et. al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  BEAN LLC d/b/a Fusion GPS
Serve: Glenn Simpson
4115 Military Road NW
Washington, DC 20015

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Louis B. Antonacci
Antonacci PLLC
501 Holland Lane #107
Alexandria, VA 22314

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: 2/15/24

*Signature of Clerk or Deputy Clerk*

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia

| | |
|---|---|
| **Louis B. Antonacci** _____ | ) ) |
| *Plaintiff* | ) ) |
| v. | )  Civil Action No. 1:24-cv-00172 |
| | ) ) |
| **Rahm Israel Emanuel et. al.** _____ | ) ) |
| *Defendant* | ) |

## AFFIDAVIT OF NONSERVICE

I, Lavinia Ringgold, being duly sworn, state:

I am a private process server, 18 years of age or older and not a party to this action or a member of a corporation or organization that is a party to this action. My address is 8360 Church Lane, Windsor Mill, MD 21244.

After careful inquiry and diligent attempts, I was unable to serve BEAN LLC d/b/a Fusion GPS as I could not find the subject or information as to the location of the subject's whereabouts.

Serve Attempt #1
Date / Time: February 23, 2024 7:38 pm
Address: 4115 Military Road Northwest, Washington, DC 20015
Photo: See Exhibit 1a below
Geolocation: https://google.com/maps?q=38.9610776347,-77.0810765262
Description of attempt: A male who appeared to be college-aged, stated Servee could not be reached at the address of service because he no longer resided there. He said he did not have any contact or forwarding information for the Servee. Refused to confirm if he was a friend or relative of the Servee or if he was a resident pf the address of service. Abruptly slammed the door.

Serve Attempt #2
Date / Time: February 26, 2024 5:25 pm
Address: 4115 Military Road Northwest, Washington, DC 20015
Photo: See Exhibit 2a below
Geolocation: https://google.com/maps?q=38.9610127133,-77.0807822327

Description of attempt: A woman answered the door. She spoke through the mail slot and stated that the Servee is not currently home. I asked if there is a good day/time that I can return to speak with him and she began pulling/closing the blinds to the windows. I get the sense that the Servee is aware that legal documents are being served to him and has told the residents at the  Address of Service to avoid sharing any information as to his availability.

Serve Attempt #3
Date / Time: March 2, 2024 5:21 pm
Address: 4115 Military Road Northwest, Washington, DC 20015
Photo: See Exhibit 3a below
Geolocation: https://google.com/maps?q=38.9611010264,-77.0811501786
Description of attempt: There was no answer at the Address of Service. Checked with neighbor at 4118. Said she does not see the Servee often. Believes they have another resident in Southern Maryland.

Serve Attempt #4
Date / Time: March 3, 2024 1:09 pm
Address: 4115 Military Road Northwest, Washington, DC 20015
Photo: See Exhibit 4a below
Geolocation: https://google.com/maps?q=38.9610193111,-77.0810313151
Description of attempt: The same male who answered the door on 2/23, came to the door and recognized mw from the previous attempt. Without opening the door and before I could ask for the Servee, he yelled through the mail slot, "He's not here. He's always going to be not here." Then he walked away.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS HEREIN ARE TRUE AND CORRECT.

Executed in

___Baltimore County_____ ,

___MD_____ on ___3/4/2024_____ .

/s/ *Lavinia Ringgold*
_____
Signature
Lavinia Ringgold
+1 (410) 262-1894



Exhibit 1a)



Exhibit 2a)



Exhibit 3a)

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 11 of 117
PageID# 1119
Case 1:24-cv-00172-MSN-LRV    Document 10-1    Filed 03/06/24    Page 6 of 6 PageID# 596



AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Virginia

| | |
|---|---|
| Louis B. Antonacci | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | )    Civil Action No. 1:24-cv-00172 |
| Rahm Israel Emanuel et. al. | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*  BEAN LLC d/b/a Fusion GPS
Serve: District of Columbia Superintendent of Corporations
1100 4th Street SW
Washington, DC 20024

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Louis B. Antonacci
Antonacci PLLC
501 Holland Lane #107
Alexandria, VA 22314

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 3/6/2024

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:24-cv-00172

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ☐ I personally served the summons on the individual at *(place)* _____

                               on *(date)* _____ ; or

    ☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

                            , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ☐ I served the summons on *(name of individual)* _____ , who is

    designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ☐ I returned the summons unexecuted because _____ ; or

    ☐ Other *(specify)*:

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

                                               _____
                                                    *Server's signature*

                                                 _____
                                                    *Printed name and title*

                                                 _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

JS 44 (Rev. 04/21)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Louis B. Antonacci

**DEFENDANTS**
Rahm Israel Emanuel, et. al.

**(b)** County of Residence of First Listed Plaintiff   Alexandria City
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Cook (IL)
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Antonacci PLLC, 501 Holland Ln, Suite 501, Alexandria, VA 22314

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question
   *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
   *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | ☐ 365 Personal Injury - | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product | Product Liability | | | 400 State Reapportionment |
| 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 330 Federal Employers' | Product Liability | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability | ☐ 368 Asbestos Personal | | 835 Patent - Abbreviated New Drug Application | 460 Deportation |
| | 340 Marine | Injury Product | | | ☒ 470 Racketeer Influenced and |
| | 345 Marine Product | Liability | | 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability | **PERSONAL PROPERTY** | **LABOR** | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit (15 USC 1681 or 1692) |
| 160 Stockholders' Suits | 350 Motor Vehicle | 370 Other Fraud | 710 Fair Labor Standards Act | | 485 Telephone Consumer |
| 190 Other Contract | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 720 Labor/Management Relations | **SOCIAL SECURITY** | Protection Act |
| 195 Contract Product Liability | 360 Other Personal | ☐ 380 Other Personal Property Damage | 740 Railway Labor Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 196 Franchise | Injury | ☐ 385 Property Damage | 751 Family and Medical | 862 Black Lung (923) | 850 Securities/Commodities/ |
| | 362 Personal Injury - Medical Malpractice | Product Liability | Leave Act | 863 DIWC/DIWW (405(g)) | Exchange |
| | | | 790 Other Labor Litigation | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 791 Employee Retirement Income Security Act | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 440 Other Civil Rights | **Habeas Corpus:** | | | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 240 Torts to Land | 443 Housing/ Accommodations | 530 General | | 871 IRS—Third Party 26 USC 7609 | 899 Administrative Procedure Act/Review or Appeal of |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment | 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| ☐ 290 All Other Real Property | 446 Amer. w/Disabilities - Other | **Other:** | 462 Naturalization Application | | 950 Constitutionality of State Statutes |
| | 448 Education | 540 Mandamus & Other | 465 Other Immigration Actions | | |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC 1962, 18 USC 1030
Brief description of cause:
Complaint by attorney against racketeering enterprise

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$105,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
Feb 1, 2024

SIGNATURE OF ATTORNEY OF RECORD
*Louis B. Antonacci*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**LOUIS B. ANTONACCI,**
**an individual,**

           **Plaintiff,**

    v.

**RAHM ISRAEL EMANUEL,**
**an individual,**

        Serve: Ambassador Rahm Emanuel
        U.S. Embassy – Tokyo
        1-10-5 Akasaka
        Minato-ku, Tokyo 107-8420

        c/o Ministry of Foreign Affairs
        2-2-1 Kasumigaseki Chiyoda-ku
        TOKYO
        100-8919 Japan
        ATTN: Consular Policy Division

**MATTHEW J. GEHRINGER,**
**an individual,**

        Serve: Matthew J. Gehringer
        1733 Asbury Avenue
        Evanston, IL 60201

**PERKINS COIE LLP,**
**a general partnership,**

        Serve: Registered Agent Solutions, Inc.
        7288 Hanover Green Dr.
        Mechanicsville, VA 23111

**PAUL J. KIERNAN,**
**an individual,**

        Serve: Corporate Creations Network, Inc.
        1629 K St. NW #300
        Washington, DC 20006

**Case No.**

**STEPHEN B. SHAPIRO,**
**an individual,**

        Serve: Corporate Creations Network, Inc.
        1629 K St. NW #300
        Washington, DC 20006

**HOLLAND & KNIGHT LLP,**
**a limited liability partnership,**

        Serve: Corporate Creations Network, Inc.
        425 W Washington Street, Suite 4
        Suffolk, VA 23434-5320

**SETH T. FIRMENDER,**
**an individual,**

        Serve: Seth T. Firmender
        Lane Construction Corp.
        90 Fieldstone Court
        Cheshire, CT 06410

**FTI CONSULTING, INC.,**
**a for-profit corporation,**

        Serve: CT Corporation System
        4701 Cox Road
        Suite 285
        Glen Allen, VA 23060-6080

**ROKK SOLUTIONS LLC,**
**a limited liability company**

        Serve: Rodell Mollineau
        4662 Charleston Terrace NW
        Washington, DC 20007

**STORIJ, INC. d/b/a The So Company**
**d/b/a Driggs Research International d/b/a**
**STOR Technologies, a for-profit corporation**

        Serve: Incorp Services, Inc.
        7288 Hanover Green Dr., Ste. A
        Mechanicsville, VA 23111-1709

**BEAN LLC d/b/a Fusion GPS,**
**a limited liability company**

  Serve: Glenn Simpson
  4115 Military Road NW
  Washington, DC 20015

**DERRAN EADDY,**
**an individual**

  Serve: Derran Eaddy
  1260 21st Street NW, Unit 510
  Washington, DC 20036

and

**SEYFARTH SHAW LLP,**
**a limited liability partnership,**

  Serve: Cogency Global, Inc.
  1025 Connecticut Ave. NW
  Suite 712
  Washington, DC 20036

    **Defendants.**

---

*The lie is my expense, the scope of my desire.*
*The Party blessed me with its future; and I protect it with fire.*
*So raise your fists and march around; just don't take what you need.*
*I'll jail and bury those commited and smother the rest in greed.*
*Crawl with me into tomorrow or I'll drag you to your grave.*
*I'm deep inside your children. They'll betray you in my name.*

      Sleep Now in the Fire
      RAGE AGAINST THE MACHINE

*The Truth is like poetry. And most people hate poetry.*

      THE BIG SHORT (2015)

3

## COMPLAINT

Plaintiff Louis B. Antonacci ("Antonacci" or "Mr. Antonacci") hereby files this

Complaint against the above-named Defendants, and states as follows:

## NATURE OF THE CASE

Ever since Antonacci, as an associate of Holland & Knight LLP, filed a RICO complaint in this Court in 2009, an insidious criminal enterpise has sought to destroy him. Various false narratives are used to justify their actions, depending on the audience at any particular time; and various actors are used to spread those false narratives. Some of those actors are for-profit enterprises operating in the stategic communications and media space. Those firms develop the false narrartives that the enterprise spreads through actors who have a personal or professional relationship with Antonacci. They are bribed with jobs, work promotions, lucrative business opportunities, or other incentives. Many of those bribes are through public officials. This enterprise's activities are ongoing and nationwide, and they have committed innumerable predicate acts against Antonacci in this Commonwealth, the District of Columbia, and Illinois.

Some of these false narratives were propagated by state and federal courts in Chicago, who defamed Antonacci in court opinions – undermining and perverting the common law – at the behest of this enterprise. Antonacci has included his petition for writ of certiorari from the U.S. Court of Appeals for the Seventh Circuit as **Exhibit A** to this complaint, together with the accompanying Appendix. In those pages alone, this Court may see – indisputably – how this enterprise uses courts of law to attack anyone who threatens to expose the corrupt nature of this enterprise.

The opinions of the Chicago courts indisputably prove the rank corruption Antonacci alleges: not only do the state courts carefully fabricate and misrepresent facts in the record (which was limited to Antonacci's complaint and pre-answer motions because, after 18 months in state court, the defendants were never even required to file an answer), but the federal courts, in their unpublished opinions holding only that Antonacci could not invoke subject matter jurisdiction, went out of their way to disparage Antonacci to discredit him. And this dicta is, in part, what the enterprise relies on to create its false narratives and justify their dissemination to the actors charged with spreading those lies. The Illinois Supreme Court's Committee on Character and Fitness even attempted to extort Antonacci into dropping his state court case, and his refusal to capitulate to their extortion made him unworthy of admission to the Illinois Bar. And Derran Eaddy later attempted to murder Antonacci on behalf this enterprise because, in Eaddy's words, Antonacci is just a "privileged white piece of shit."

In 2019, this enterprise launched its activities against Antonacci in this Commonwealth, by attempting to associate Antonacci with dubious claims that it carefully orchestrated by and between a general contractor, who was Antonacci's client, its architect, and the project owner of the 395 Express Lanes development. Seth Firmender, the General

Counsel of Antonacci's client, The Lane Construction Corp., agreed to work with this enterprise in its attempt to set up Antonacci for pursuing Lane's fabricated claim against its architect, whose attorney was aware of the scheme and worked to help achieve it.

This enterprise's deleterious effect on the legal profession and American culture is manifest in our country's decline. In their view, political power and money give you a monopoloy on the truth, even if courts of law have to discredit themselves to fabricate their false reality. This is not a cultural issue dependent upon political power or local jurisdiction. This is federal racketeering being perpetrated by officers of the court – the very people charged with protecting against these crimes. They have created a race to the bottom in the profession responsible for maintaining the credibility of our political institutions. And our political dysfunction breeds the results. There can be no faith in America's legal system while this enterprise acts with impunity.

As a final point of introduction, because Antonacci's federal case was dismissed for want of subject matter jurisdiction, neither res judicata nor collateral estoppel apply to this case. In their haste to defame Antonacci and protect the people who administer this enterprise – and the opportunists who join them – those courts decided nothing of legal significance to the instant case. They succeeded only in proving that this enterprise has infiltrated federal courts as well. And, as further described below, the enterprise's activity has been ongoing ever since. This Court should therefore review all allegations below *de novo*. And any applicable statutes of limitations should be tolled because 1) the nature of this enteprise is imperceptible by design, and 2) Antonacci was prejudiced by demonstrable fraud perpetrated by jurists.

Antonacci does not claim to be perfect, but, unlike this enterprise, he takes the practice of law seriously. And Antonacci's SCOTUS petition, the allegations pertaining thereto, and the enterprise's subsequent predicate acts demonstrate that this enterprise presents much more than a "threat" of continued racketeering activity. Through its repeated patterns of behavior, this enterprise betrays its belief that it is simply above the law. Antonacci disagrees.

## PARTIES

1.     Mr. Antonacci is an individual and a citizen of the Commonwealth of

Virginia. Mr. Antonacci is licensed to practice law in the Commonwealth of Virginia, the

District of Columbia, the State of Maryland, and the State of Wisconsin. Mr. Antonacci

has been admitted to this Court since 2009.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 21 of 117
Case 1:24-cv-00172    Document 9    Filed 02/14/24    Page 6 of 101 PageID# 6
PageID# 1129

2.      **Rahm Israel Emanuel ("Emanuel")** is an individual, former Mayor of the City of Chicago, and current U.S. Ambassador to Japan. All acts by Emanuel alleged herein were prior to his appointment as Ambassador to Japan on December 18, 2021.

3.      **Matthew J. Gehringer ("Gehringer")** is an individual, an attorney licensed in the State of Illinois, the former General Counsel of Perkins Coie, and a citizen of Cook County, Illinois. All of Gehringer's acts alleged herein were on behalf of himself, Perkins Coie, Seyfarth, and Anita J. Ponder ("Ponder), a former partner at Seyfarth who Gehringer represented as counsel of record in Antonacci's state and federal cases against Ponder, Seyfarth, Perkins Coie and Gehringer in Chicago. It should be noted, after Antonacci opened this action in PACER, but before filing this complaint, Gehringer seems to have left Perkins Coie. (*See* **Antonacci Ltr. to Bates Larson ("Larson"), General Counsel of Perkins Coie, <u>Ex. K</u>.**) Larson was co-counsel with Gehringer in Antonacci's State Court Case in Chicago. Antonacci will reiterate that Gehringer was the architect of the enterprise's criminal conspiracy against Antonacci in Chicago. The fact that Gehringer suddenly disappeared from Perkins Coie, once he got word of this action being initiated, betrays his and Perkins Coie's complicity in the ongoing acts of this enterprise, particularly here in this Commonwealth.

4.      **Perkins Coie LLP ("Perkins Coie")** is a general partnership organized under the laws of Washington State, with a registered office in the Commonwealth of Virginia.

5.      **Paul J. Kiernan ("Kiernan")** is an individual, an attorney licensed in the District of Columbia, and a partner at Holland & Knight LLP. All acts by Kiernan alleged herein were on behalf of himself and Holland & Knight.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 22 of 117
Case 1:24-cv-00172   Document 9   Filed 02/14/24   Page 7 of 101 PageID# 7
PageID# 1130

6.    **Stephen B. Shapiro ("Shapiro")** is an individual, an attorney licensed in the Commonwealth of Virginia, and a partner at Holland & Knight LLP. All acts by Shapiro alleged herein were on behalf of himself and Holland & Knight.

7.    **Holland & Knight LLP ("Holland & Knight")** is a Florida limited liability partnership with a registered office in Virginia.

8.    **Seth T. Firmender ("Firmender")** is an individual, an attorney licensed in Colorado and Connecticut, and the General Counsel of The Lane Construction Corp. ("Lane"). All acts by Firmender alleged herein were ultra vires to his duties as General Counsel of Lane because they were contrary to the interests of Lane and its shareholders and sought primarily to benefit Firmender and the criminal enterprise alleged herein, to the detriment of Lane.

9.    **FTI Consulting, Inc. ("FTI")** is a corporation organized under the laws of the State of Maryland, with registered office in Virginia.

10.   **Rokk Solutions, LLC ("Rokk")** is a limited liability company organized under the laws of the District of Columbia.

11.   **Storij, Inc. d/b/a The So Company and d/b/a Driggs Research International and d/b/a STOR Technologies ("Storij")** is a for-profit corporation organized under the laws of the State of Delaware, with a registered office in Virginia. Storij is a front company for the enterprise to collect human intelligence data and illegally, or through fraudulently obtained search warrants, exploit the computer systems and mobile devices of its targets.

12.   **BEAN LLC, d/b/a Fusion GPS ("Fusion GPS")** is a Delaware limited liability company with a place of business in the District.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 23 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 8 of 101 PageID# 8
PageID# 1131

13.    **Derran Eaddy ("Eaddy")** is an individual, a DC citizen, and a strategic communications professional with an office located in Washington, DC: www.derraneaddy.com.

14.    **Seyfarth Shaw LLP ("Seyfarth")** is a limited liability partnership organized under the law of the State of Illinois, with its principal place of business located in the State of Illinois.

## JURISDICTION

15.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because some of the claims asserted herein arise under the laws of the United States.

16.    This Court has personal jurisdiction over all the Defendants pursuant to Va. Code 1950 § 8.01-328.1 because the Defendants transact business in this Commonwealth and/or caused tortious injury by act or omission in this Commonwealth.

17.    This Court also has personal jurisdiction over the Defendants pursuant to 18 U.S.C. 1965(d) because all the Defendants reside in this judicial district, have an agent here, and/or transact their affairs in this Commonwealth, either directly or through their agents and/or co-conspirators.

18.    Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. 1965 because a substantial part of the events giving rise to the claims occurred here, and Defendants reside and transact their business in this Commonwealth, either directly or through their agents.

## FACTS COMMON TO ALL COUNTS

19. Mr. Antonacci is an attorney who has been licensed to practice law since 2004. Mr. Antonacci is licensed to practice in the State of Wisconsin, the Commonwealth of Virginia, the District of Columbia, and the State of Maryland. Mr. Antonacci has never been disciplined or sanctioned for his conduct as an attorney, nor has a bar complaint ever been filed against him, nor has anyone ever alleged legal malpractice against him.

20. While in law school, Mr. Antonacci served as an Honors Intern for both the Criminal Division of the U.S. Department of Justice and the General Counsel of the U.S. Air Force at the Pentagon.

21. Immediately upon graduating with honors from the University of Wisconsin Law School in 2004, Mr. Antonacci began work as a Civilian Honors Attorney for the U.S. Army Corps of Engineers in Huntsville, Alabama. In that capacity, Antonacci was the lead attorney for the Corps's chemical demilitarization program, where he worked extensively with the Russian Ministry of Defense and performed a temporary assignment in Baghdad, Iraq, in support of our reconstruction mission there. Antonacci was granted and maintained security clearances with both DOJ and DOD.

22. In 2006, Mr. Antonacci relocated to Northern Virginia to work in private practice for Watt Tieder Hoffar & Fitzgerald LLP, where he represented clients in federal government contract and commercial disputes in federal and state courts.

23. **Mr. Antonacci has never been a political appointee.** And while he was a civil servant under G.W. Bush's administration, **he has never worked for any administration of the Democratic party.** He has never been employed by any political campaign or committee in any capacity.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 25 of 117
Case 1:24-cv-00172    Document 1  Filed 02/14/24    Page 10 of 101 PageID# 10
PageID# 1133

24.   Antonacci was recruited from his associate position at Watt Tieder Hoffar & Fitzgerald LLP to work as an associate at Holland & Knight LLP in its Washington, DC office.

25.   While he was an associate at Holland & Knight LLP, Mr. Antonacci filed a federal lawsuit in this Court asserting RICO and state law fraud claims against an alleged enterprise that sought to defraud a firm client out of $4,000,000 **(1:09-cv-00927 LMB-TRJ)** ("Katz Fraud Case").

26.   Mr. Antonacci built the Katz Fraud Case while pursuing a $4,000,000 consent judgment against the judgment debtor in Fairfax County Circuit Court. Counsel for the judgment debtor, Gerald I. Katz ("Katz"), defied court orders and subpoenas to conceal the extensive fraud perpetrated by the judgment debtor in conveying away its assets.

27.   Katz was sanctioned by Fairfax County Circuit Court for his conduct in those proceedings.

28.   Through the discovery Mr. Antonacci was ultimately able to obtain, he discovered a carefully executed scheme designed and orchestrated by Katz, who had expressly planned to abuse discovery practice in Fairfax County Circuit Court to conceal evidence of his fraudulent scheme. Mr. Antonacci used that evidence to put together the Katz Fraud Case.

29.   Katz was named as a defendant in the original version of the Katz Fraud Case because Antonacci's client could gain a strategic advantage by doing so, and because there was incontrovertible evidence that the fraudulent scheme had been designed and orchestrated by Katz.

30.    Antonacci's supervising partner, Steven J. Weber, and the Construction and Design Group's practice group leader at that time, the late Andrew J. Stephenson, both fully supported that strategy.

31.    When Mr. Antonacci notified Holland & Knight's DC office management that the firm's client was planning to sue Katz, Kiernan, who was the executive partner of Holland & Knight's DC office at that time, called a meeting with Mr. Antonacci, Weber, and Stephenson.

32.    During that meeting, Kiernan indicated that naming Katz as a defendant was not legally viable because the agent immunity doctrine precludes conspiracy claims between attorney and client.

33.    Mr. Antonacci indicated that he was well aware of the agent immunity doctrine, but because the conspiracy extended to third parties outside of the attorney-client relationship, the agent immunity doctrine did not apply to the Katz Fraud Case.

34.    Mr. Antonacci nonetheless indicated that he was just an associate, so if the firm did not wish to name Katz as a defendant, then he would not do so because that was not his decision to make.

35.    Kiernan became visibly angry and abruptly ended the meeting.

36.    After further pressure from Kiernan, Mr. Antonacci removed Katz from the Katz Fraud Case.

37.    Kiernan resisted this limitation of the agent immunity doctrine because this enterprise uses lawyers like Kiernan and Katz to commit and conceal their fraudulent schemes.

38.    Mr. Antonacci filed the Katz Fraud Case in this court on August 18, 2009.

39.     After this court denied the defendants' initial motion to dismiss, the case settled quickly.

40.     Mr. Antonacci's supervising partner, Mr. Steven J. Weber, was terminated from the firm shortly after the Katz Fraud Case settled.

41.     Weber was fired for breach of his partnership agreement, though he was largely absent from the firm throughout most of Antonacci's tenure there.

42.     One of Weber's clients stayed with the firm as Mr. Antonacci's client, despite that Mr. Antonacci was a mid-level associate at the time. That client was an Iraqi firm for whom Antonacci had won seven figures in claims before the U.S. Armed Services Board of Contract Appeals.

43.     Mr. Antonacci was subsequently assigned to represent a firm client in a second request pursuant to the Hart-Scott-Rodino Antitrust Improvements Act. Mr. Antonacci successfully managed the production and review of millions of client documents to DOJ in that matter, managing over a hundred contract attorneys and numerous vendors.

44.     Around the same time, Antonacci won a motion confirming a AAA arbitration award in the U.S. District Court for the Southern District of New York, despite opposing counsel being disbarred during the arbitration. The District Judge essentially copied Antonacci's brief in issuing its opinion.

45.     Mr. Antonacci billed 267 hours in March 2010.

46.     In April 2010, the day after Mr. Antonacci's work on the second request was completed and DOJ's Antitrust Division approved the merger at issue, Mr. Antonacci was asked to resign with three-days' notice.

47.     Prior to Mr. Antonacci's forced resignation, and shortly after the Katz Fraud Case settled, the firm had admonished Mr. Antonacci for being in an inappropriate relationship with Ms. Livya Heithaus ("Livya"), another associate at the firm.

48.     When Mr. Antonacci asked what was inappropriate about their relationship, firm partners indicated that they spent too much time together and stood too close together, so it was apparent they were in a relationship and they should stop spending so much time together.

49.     Livya was married to Mr. James Blowitski at that time, a DC resident who attended the University of Maryland at College Park with Livya. Mr. Blowitski worked at Lockheed Martin at that time.

50.     The morning before the firm's meeting with Mr. Antonacci regarding his relationship with Livya, Livya emailed Mr. Antonacci to tell him that the firm had spoken to her about their relationship.

51.     This meeting with Antonacci was a charade. It was meant only to harass and confuse Mr. Antonacci. Because Antonacci and Livya were at the same level at the firm, Antonacci did not supervise Livya in any way, so it was not clear why the firm would be concerned about their relationship.

52.     In fact, numerous of Weber's administrative assistants had complained to the firm that Weber sexually harassed them, but rather than taking action against Weber, the firm simply paid those administrative assistants for a release of claims against the firm, and reassigned them.

53.     Given the rampant mismanagement pervading Holland & Knight's DC office, Mr. Antonacci had already begun looking for another job. At that time, because

Mr. Antonacci was an extremely successful attorney in government contracts and commercial litigation, recruiters called Mr. Antonacci on a daily basis seeking to place him in a number of positions.

54.     Before the firm forced Mr. Antonacci to resign, a partner at Sheppard Mulling LLP called Shapiro to tell him that they were going to offer Mr. Antonacci a position as a senior associate there.

55.     Shapiro knowingly defamed Antonacci to prevent him from being offered the position at Sheppard Mullin.

56.     Shapiro prevented Mr. Antonacci from getting another job because the criminal enterprise further described below, of which he and Kiernan are a part, are afraid of the legal theories espoused by Mr. Antonacci in the Katz Fraud Case, so they wished to end his career as quickly as possible.

57.     Kiernan and Shapiro also sought retaliation against Antonacci for exposing the corrupt law practice of Katz, who is part of their criminal enterprise. While Antonacci simply thought he was doing his job well, Kiernan and Shapiro saw his success as a threat to their way of "practicing law."

58.     Kiernan, Shapiro, Emanuel, FTI, Fusion GPS, Rokk, and others have been spreading the false narrative that Livya was married to a partner at Holland & Knight, rather than Blowitski, as an attempt to justify why Antonacci was forced to resign from Holland & Knight, and to falsely justify their actions in preventing him from obtaining gainful employment.

14

Case 1:24-cv-00172-MSN-LRV Document 91-2 Filed 04/10/24 Page 30 of 117
Case 1:24-cv-00172 Document 1-9 Filed 02/14/24 Page 15 of 101 PageID# 15
PageID# 1138

59. Another false narrative spread by this enterprise, and specifically by Rokk, is that Antonacci was laid off during the mass layoffs of 2009. The enterprise spreads this narrative as a way to falsely justify why a successful attorney was suddenly unemployed.

60. In fact, Antonacci was so busy during 2009 that it would have been impossible to layoff Antonacci in 2009.

61. Moreover, Shapiro and another senior attorney in that group called a meeting with Antonacci to tell him explicitly, without him even asking, that he should not look for another job in 2009 because his position with the firm was secure, despite the layoffs.

62. Kiernan, Shapiro, and Emanuel, by themselves and through FTI, Rokk, Fusion GPS, and others, have continued defaming Mr. Antonacci in order to prevent him from gaining legal employment, so that he could not promote legal theories that could implicate dubious attorneys like Kiernan, Shapiro, and Katz.

63. Katz has since been disbarred from the Virginia Bar, the DC Bar, the Maryland Bar, and the bar of the Court of Federal Claims.

64. On April 27, 2010, Mr. Antonacci was asked to resign from the firm with three days' notice. The release he signed was procured through fraud. Had Mr. Antonacci known that this enterprise would seek to destroy his career and prevent him from gaining subsequent employment, he never would have signed the release.

65. Kiernan's wife, Ms. Leslie Kiernan ("Leslie Kiernan"), worked as senior counsel in the Obama Administration.

66. Leslie Kiernan is currently General Counsel of the U.S. Department of Commerce. She was appointed to that position by President Biden.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 31 of 117
Case 1:24-cv-00172  Document 1  Filed 02/14/24  Page 16 of 101 PageID# 16
PageID# 1139

67.    Leslie Kiernan interviewed Judge Diane Wood of the Seventh Circuit for the SCOTUS position later filled by Sonia Sotomayor.

68.    At all times relevant to these proceedings, Judge Wood was the Chief Judge for the U.S. Court of Appeals for the Seventh Circuit.

69.    Judge Wood chaired the panel and wrote the opinion in Mr. Antonacci's appeal before the Seventh Circuit described below. That opinion is reproduced in the Appendix to Mr. Antonacci's SCOTUS petition, attached hereto as **Exhibit A.**

70.    When Leslie Kiernan interviewed Judge Wood, Leslie Kiernan was an attorney in private practice.

71.    Leslie Kiernan indicated to Judge Wood that Mr. Antonacci was an enemy of their criminal enterprise, and thus she should deny him any relief sought in her court and seek to defame him in her opinion.

72.    As stated above, Antonacci was forced to resign from Holland & Knight, and was prevented from being offered another job, on April 30, 2010. Despite being heavily recruited for a wide variety of legal positions before his forced resignation, Mr. Antonacci was unable to find another job 16 for months.

73.    Kiernan, Shapiro and Emanuel engaged their enterprise to prevent Mr. Antonacci from obtaining employment. They continue to do so.

74.    Kiernan, Shapiro and Emanuel engaged their enterprise to prevent Mr. Antonacci from obtaining another job because they were afraid that legal theories promoted by Antonacci could implicate attorneys like Kiernan, Shapiro, and Katz, who this enterprise, and particularly political tools like Emanuel, use to conceal the criminal and fraudulent acts of this enterprise.

16

75. On May 3, 2010, Mr. Philip Tucker Evans ("Evans"), a partner at Holland & Knight who was Antonacci's assigned "mentor," reached out to apologize to Antonacci for the way things worked out at that firm.

76. Evans disingenuously offered to help Mr. Antonacci by acting as a reference for him.

77. Kiernan and Shapiro asked Evans to stay in contact with Antonacci so that the enterprise could continue defaming Antonacci and prevent him from gaining future employment.

78. Evans, on behalf of Holland & Knight and this enterprise, has been actively defaming Antonacci on behalf of this enterprise ever since.

79. Emanuel worked as White House Chief of Staff to President Barack Obama from January 2009 to October 2010.

80. Emanuel is a leader of this enterprise. While he was in the greater Washington area working as Obama's Chief of Staff, Emanuel, Paul Kiernan, Shapiro, and Katz, agreed to use their enterprise to destroy Antonacci's legal career because his contempt for corruption posed a threat to them.

81. In October of 2010, Emanuel left his job as Chief of Staff to President Obama to run for Mayor of Chicago.

82. In early 2011, Livya moved out of the condominium where she had lived with Blowitski and moved into her own apartment in DC's NOMA neighborhood.

83. Blowitski was aware of Livya's affair with Antonacci since 2010.

84.    In August of 2011, after 16 months of unemployment, Mr. Antonacci relocated to his hometown of Chicago, Illinois to accept a job offer from Seyfarth to work as an attorney in its commercial litigation practice group.

85.    This was a trap set by this enterprise, particularly through Kiernan, Seyfarth and Emanuel.

86.    Livya divorced Blowitski in 2011, and moved to Chicago in January 2012.

87.    Livya transferred to the Chicago office of Holland & Knight.

88.    In August of 2011, around the same time Antonacci was offered the job at Seyfarth, the City of Chicago retained Ponder and Seyfarth to advise the City on certain aspects of its Minority and Women Owned Business Enterprise Program ("DPS Matter").

89.    Mr. Antonacci was initially tasked to work with Ponder on the DPS Matter.

90.    The City of Chicago retained Ponder and Seyfarth at the direction of City of Chicago Mayor Rahm Emanuel. Both Emanuel and Ponder are part of this enterprise.

91.    Prior to being retained on the DPS Matter, Ponder had lobbied the City for over a decade.

92.    Prior to working for Seyfarth, Ponder had been fired from multiple law firms because she is impossible to work with and regularly harasses those assigned to work with her.

93.    Ponder's value to this enterprise is to compromise the careers of attorneys who advocate for the rule of law and could thus pose a threat to this enterprise.

94.    Through his father, Mr. Tino Antonacci, the Plaintiff met with Jay Doherty ("Doherty"), former president of the City Club of Chicago, prior to accepting the

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 34 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 19 of 101 PageID# 19
PageID# 1142

job offer from Seyfarth. Doherty insisted that Ponder is a "team player" and a good person for whom to work.

95.      Doherty was recently convicted of bribery in the U.S. District Court of the Northern District of Illinois, in connection with former Illinois House Speaker Michael Madigan, also under federal indictment, and this enterprise.

96.      At the time the City retained Ponder, Ponder had hundreds of thousands of dollars of federal tax liens outstanding.

97.      And to be clear, Ponder's "work" up to that point had largely been as a City lobbyist. Ponder was paid millions by City contractors to steer city contracts to them. The only skill required for this work was her relationship with Mike and Lisa Madigan. Yet this "government contracts lawyer" could not be bothered to pay her federal taxes with the millions she was paid normalizing procurement fraud.

98.      Emanuel, on behalf of the City of Chicago, retained Ponder in order to divert Chicago taxpayer money to Ponder so that she could satisfy her federal debts and compromise Antonacci's legal career, which Emanuel, through information received from the Kiernans and Shapiro, deems a threat to this enterprise.

99.      Mr. Antonacci applied for admission to the Illinois Bar in April 2012.

100.    Mr. Antonacci was not required to take the Illinois Bar exam as a result of his prior qualifying practice.

101.    Despite successfully working with numerous attorneys at Seyfarth, and being retained by a prestigious non-profit organization, Mr. Antonacci was summarily terminated on May 22, 2012, being told that his work with Ponder months earlier was the issue.

102. Seyfarth nonetheless characterized Antonacci's termination as a "layoff" and tried to hide evidence of Ponder's defamatory statements concerning Antonacci, as further discussed below.

103. Antonacci was terminated at the behest of Emanuel, Kiernan and Shapiro, who deem Antonacci a threat to their criminal enterprise.

104. Emanuel assured Seyfarth and Ponder more legal work from the City of Chicago in exchange for Seyfarth's termination of Antonacci, which they received.

105. Antonacci was terminated summarily from Seyfarth the day after Livya left Holland & Knight to work for Shiff Hardin LLP (now ArentFox Schiff LLP).

106. Antonacci was terminated the day after Livya left Holland & Knight to support the enterprise's false narrative that Antonacci had somehow "stolen" the wife of a Holland & Knight partner, and thus he had poor judgment and the retaliation inflicted on Antonacci was justified.

107. The real reason Antonacci was terminated was to prevent him from promoting legal theories that would implicate this enterprise.

108. Moreover, while Antonacci had prevailed for Holland & Knight and its client in the Katz Fraud Case, and many other cases for the firm and its clients, Kiernan, Emanuel, Katz and Shapiro saw Antonacci's victory as exposing the corrupt nature of their enterprise.

109. Later in 2012, Blowitski, Livya's ex-husband, suddenly lost consciousness and went into a coma. When he awoke, he had lost many recent memories and could not form new memories. He was later diagnosed with permanent retrograde amnesia caused by an unknown virus.

## ANTONACCI'S STATE COURT CASE AND ILLINOIS BAR ADMISSION

110. Turning back to Antonacci's termination from Seyfarth, Seyfarth indicated to Mr. Antonacci that the reason for his termination was a layoff.

111. Seyfarth offered Mr. Antonacci eight weeks of severance pay in exchange for a release of claims against Seyfarth. Mr. Antonacci never signed any release of claims against Seyfarth.

112. Because Ponder frequently harassed and lied to Mr. Antonacci while he was working with her at Seyfarth, Mr. Antonacci requested all evaluations of his performance while at Seyfarth.

113. Seyfarth provided Mr. Antonacci his performance evaluations the following day, May 23, 2012, which provided overwhelmingly positive reviews of his performance at Seyfarth, though there were no formal performance evaluations from Ponder.

114. Antonacci hired a local attorney, Major and Major Law, who requested Antonacci's personnel file from Seyfarth.

115. Mr. Antonacci's personnel file revealed an email from Seyfarth Professional Development Consultant, Ms. Kelly Gofron, memorializing numerous lies perpetrated by Ms. Ponder concerning Mr. Antonacci and his work ("Ponder Slander Email"), including that Antonacci had engaged in the unauthorized practice of law while working under her supervision, which is a legal impossibility under Illinois law.

116. Seyfarth did not include the Ponder Slander Email in its response to Mr. Antonacci's request for all evaluations of his performance while at Seyfarth.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 37 of 117
Case 1:24-cv-00172    Document 1    Filed 02/15/24    Page 22 of 101 PageID# 22
PageID# 1145

117.    Seyfarth withheld the Ponder Slander Email so that Antonacci would not realize the tools being used by this enterprise to damage his legal career, preventing him from espousing legal theories that would implicate the Defendants.

118.    Utilizing interstate communications, Seyfarth knowingly withheld the Ponder Slander Email and falsely indicated to Mr. Antonacci, via electronic mail, that it did not exist.

119.    Antonacci's employment with Seyfarth and Ponder was a trap set by this enterprise through Kiernan and Emanuel – it was the only job offer he received after 16 months of unemployment.

120.    Mr. Antonacci drafted the Verified Complaint, including a cause of action for defamation *per se*, and sent it to Major and her associate on September 28, 2012.

121.    Ms. Major transmitted the Verified Complaint to Corporation Counsel for the City of Chicago, Mr. Stephen Patton, to ensure that the Verified Complaint did not disclose any confidential or attorney-client privileged information pertaining to the DPS Matter.

122.    Major and Mr. Antonacci edited the Verified Complaint multiple times to address the City's concerns regarding potential disclosure of confidential or attorney-client privileged information.

123.    The Verified Complaint contained over 300 concise allegations and contained several probative exhibits substantiating many of those allegations.

124.    On November 5, 2012, Mr. Antonacci's Illinois Bar application was assigned to Ms. Ellen S. Mulaney ("Mulaney"), Illinois Bar Character and Fitness Committee, for review.

125.    On November 19, 2012, Mulaney scheduled an Illinois Supreme Court Rule 708 interview with Mr. Antonacci for November 27, 2012.

126.    Major filed the Verified Complaint in Cook County Circuit Court on November 21, 2012, captioned *Antonacci v. Seyfarth Shaw LLP and Anita J. Ponder*, Civil Case No. 2012 L 13240 ("Circuit Court Case").

127.    On November 25, 2012, Mulaney rescheduled her interview with Mr. Antonacci indefinitely.

128.    On November 29, 2012 Mr. Joel Kaplan ("Kaplan"), Seyfarth General Counsel, spoke with Ms. Major and made a settlement offer of $100,000 on behalf of the Defendants.

129.    On November 29, 2012, Mr. Antonacci requested that Major to make a counteroffer to the defendants in the Circuit Court Case. Major never responded to Mr. Antonacci's request.

130.    On December 3, 2012, Mulaney indicated to Mr. Antonacci, via electronic mail, that "[b]ecause of the complexity of your file, the Chairman of our committee has decided that the initial interview should be bypassed and we will go directly to a three person panel to conduct your interview."

131.    Because Major never responded to Mr. Antonacci's November 29, 2012, request, Mr. Antonacci followed up with Major on December 6, 2012. Major indicated, via electronic mail message, that Kaplan was "not very happy" and that settlement communications were over for the "near future."

132.    During their telephone conversation, utilizing interstate communications, Major agreed with Kaplan to work with Seyfarth, Ponder, Gehringer, and Emanuel, either

through himself or through the City of Chicago's Office of the Corporate Counsel, to sabotage Mr. Antonacci's case and damage his professional reputation.

133. From December 2012 through October 2016, Major has had many further telephone conversations and email communications with Gehringer, Seyfarth, Ponder, Kaplan, and others working on behalf of Gehringer, to sabotage Mr. Antonacci's case in the Circuit Court.

134. Major conspired with Emanuel, Gehringer, Seyfarth, Kaplan, and Ponder to

a. keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b. file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

c. include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

d. unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 40 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 25 of 101 PageID# 25
PageID# 1148

Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

e.    deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

f.    if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.    Gehringer agreed to coordinate with Judge Eileen M. Brewer Brewer ("Judge Brewer"), Judge Brewer's law clerk, Mr. Matthew Gran ("Gran"), and any other Cook County Circuit Court judges, as necessary, to pass instructions to Judge Brewer concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

h.    Major agreed to write a letter to City of Chicago Deputy Corporation Counsel, Mardell Nereim ("Nereim"), and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

i.    Gehringer agreed to conspire with others as needed moving forward.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 41 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 26 of 101 PageID# 26
PageID# 1149

135.    Mr. Antonacci's Inquiry Panel originally consisted of Mulaney, Mr. John Storino ("Storino"), and Mr. Matthew Walsh ("Walsh").

136.    Gehringer conspired to have Storino removed from the Inquiry Panel.

137.    Via email dated December 18, 2013, Mulaney falsely indicated to Antonacci that Mr. Storino "asked to be excused from the Panel because his time constraints made it impracticable."

138.    Storino asked to be removed from the Inquiry Panel, at the direction of Gehringer or those working on his behalf, so that the First District Chairman of the Character and Fitness Committee, Mr. Philip Bronstein ("Bronstein"), could replace Storino with Ms. Jeanette Sublett ("Sublett"), Member of Neal & Leroy. All of Sublett's acts alleged herein were on behalf of this enterprise.

139.    Neal & Lerory received approximately $801,070 in legal fees from the City of Chicago in 2011.

140.    Neal & Leroy received approximately $796,330 in legal fees from the City of Chicago in 2012.

141.    Mulaney scheduled Mr. Antonacci's Inquiry Panel meeting date for Friday, January 25, 2013 at the offices of Neal & Lerory.

142.    Judge Brewer was assigned to the Circuit Court Case. Brewer is a member of this enterprise.

143.    At the time the Circuit Court Case was pending, Brewer was in a legal dispute with her domestic partner, where she was attempting to force the sale of a townhome that they co-owned.

26

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 42 of 117
Case 1:24-cv-00172    Document 1  Filed 02/14/24    Page 27 of 101 PageID# 27
PageID# 1150

144.    In exchange for her criminal acts of fraud as judge in the Circuit Court Case – which is demonstrated by the record itself – the enterprise forced a settlement of the dispute that was favorable to Brewer. The Illinois Supreme Court later overruled the appellate court ruling that was the basis of Brewer's settlement. *See Blumenthal v. Brewer*, 24 N.E.3d 168, 2014 Ill. App. 132250 (Ill. App. Ct. 2014) and *Blumenthal v. Brewer*, 2016 IL 118781.

145.    Defendants thereafter moved to seal the Verified Complaint, on the basis that it disclosed confidential or attorney-client privileged information. On January 7, 2013, Judge Brewer sealed the Verified Complaint pending resolution of the Motion to Seal.

146.    Immediately after the hearing of January 7, 2013, Major sent Mr. Antonacci, via electronic mail, a draft letter to Patton, whereby Major sought the City's express assurance that the City did not object to the allegations in the Verified Complaint.

147.    Mr. Antonacci advised Major that it was imprudent to send such a letter, but Major insisted and consequently sent the letter via U.S. and electronic mail.

148.    Nereim responded on behalf of the City of Chicago on January 18, 2013, where she stated that the City had not expressly waived the attorney-client privilege and that the Verified Complaint "went further than the City would have liked."

149.    The Inquiry Panel later declined Mr. Antonacci's certification to the Illinois Bar. The Inquiry Panel relied heavily upon Nereim's letter in its report declining Mr. Antonacci's certification to the Illinois Bar.

150.    Major sent the January 8, 2013 letter to Patton at the direction of Gehringer. Gehringer directed Nereim and/or Patton to allow Nereim to respond to

Major's January 8, 2013 letter. Gehringer instructed Nereim and/or Patton as to the language to include in Nereim's January 18, 2013 response.

151. Gehringer notified the Inquiry Panel that Nereim's letter would be forthcoming and further instructed them how to use the letter to intimidate Mr. Antonacci.

152. Gehringer transmitted the City's January 18, 2013 letter to the Inquiry Panel via electronic mail.

153. Gehringer orchestrated the City's response in order to intimidate Mr. Antonacci so that he would withdraw and/or settle the Circuit Court Case on defendants' terms.

154. Gehringer and Perkins Coie subsequently filed an appearance on behalf of the Defendants.

155. Gehringer conspired with the Inquiry Panel and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

156. The enterprise placed Mr. Antonacci on a list of attorneys disfavored by Cook County Circuit Court judges (the "Blacklist"). The Blacklist is circulated to certain attorneys, law firms, and City and County organizations via U.S. and electronic mail, utilizing interstate communications. Those who receive the Blacklist are instructed by the Enterprise to injure the attorneys on the Blacklist in any way possible. Cook County Circuit Court judges consistently rule against and harass attorneys who appear on the Blacklist.

157.    Mr. Antonacci met with the Inquiry Panel at the offices of Neal & Leroy on January 25, 2013. The Inquiry Panel was openly hostile towards Mr. Antonacci throughout the proceedings, unjustifiably questioning his prior practice of law as an Honors Attorney for the Government of the United States and law firms in Washington, D.C. and Northern Virginia. The Inquiry Panel unjustifiably questioned his intentions in filing the Circuit Court Case, and inexplicably determined that his application could not be resolved until defendants' motion to dismiss was ruled upon. The Inquiry Panel inexplicably reasoned that the Circuit Court had jurisdiction to determine whether Mr. Antonacci had violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

158.    The Inquiry Panel sought to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

159.    Mr. Antonacci refused to withdraw the Circuit Court Case, and merely indicated that he would forward the hearing transcript of the April 2, 2013 hearing on the defendants' motion to dismiss as soon as he received it.

160.    A few hours after Mr. Antonacci left the offices of Neal & Leroy, Mulaney emailed Mr. Antonacci and falsely indicated that she had forgotten to mention that morning that her son, Mr. Charles Mulaney, was an attorney at Perkins Coie. Mulaney further indicated that Gehringer had recently filed an appearance in the Circuit Court Case, and that while her son was not involved in the case, she would ask the Chairman about reconstituting the Inquiry Panel if Mr. Antonacci objected to her involvement.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 45 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 30 of 101 PageID# 30
PageID# 1153

161. Due to inclement weather, Walsh was over 90 minutes late to the Inquiry Panel meeting of January 25, 2013. Mr. Antonacci, Mulaney, and Sublett were all present at Neal & Leroy waiting for Walsh for 90 minutes before the meeting commenced.

162. Mulaney had not forgotten that morning to ask Mr. Antonacci whether he objected to Mulaney's participation as a result of her son working for Perkins Coie. Mulaney sought to harass and intimidate Mr. Antonacci into withdrawing the Circuit Court Case. When Mr. Antonacci refused to do so, she sought to distance herself from the conspiracy because she knew that the ongoing pattern of defrauding, harassing, and intimidating Mr. Antonacci violated state and federal criminal law.

163. On April 2, 2013, Judge Brewer dismissed the Verified Complaint and granted Mr. Antonacci leave to file an amended complaint. Judge Brewer baselessly criticized the Verified Complaint as "incoherent", yet failed to identify even one allegation that was unclear. Judge Brewer further ordered that Mr. Antonacci not include relevant facts in his Amended Complaint. Judge Brewer acknowledged that she could not find that Mr. Antonacci violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

164. Mr. Antonacci immediately asked Major to request dismissal with prejudice so that he could stand on his Verified Complaint. Major insisted that she file an Amended Complaint.

165. On April 11, 2013, Mr. Antonacci transmitted the transcript from the April 2, 2013 hearing to the Inquiry Panel, per its request. Because Judge Brewer acknowledged on the record that she could not find that Mr. Antonacci violated the

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 46 of 117
Case 1:24-cv-00172   Document 1-9   Filed 02/14/24   Page 31 of 101 PageID# 31
PageID# 1154

Illinois Rules of Professional Conduct, Mr. Antonacci expected a favorable resolution of his application.

166.    Mulaney responded on April 11, 2013, via electronic mail, by asking Mr. Antonacci to keep the Inquiry Panel apprised of developments in the Circuit Court Case.

167.    On April 23, 2013, Mr. Antonacci requested that "each member of [the] Inquiry Panel, as well as [Illinois Board of Bar Examiners member] Ms. [Vanessa] Williams, disclose to [Mr. Antonacci] any personal relationships or professional affiliations that they have with Ms. Anita Ponder. [Mr. Antonacci] further request[s] that each member of the Inquiry Panel, as well as Ms. Williams, disclose any communications, oral or written, with Ms. Ponder or Seyfarth Shaw, or anyone on behalf of Anita Ponder or Seyfarth Shaw, concerning [Mr. Antonacci]."

168.    On April 24, 2013, the Inquiry Panel issued its report declining to certify Mr. Antonacci's Illinois Bar application.

169.    The Inquiry Panel never responded to Mr. Antonacci's request that it disclose inappropriate affiliations or communications with Seyfarth or Ponder, or anyone on their behalf. The Inquiry Panel failed to disclose this information because it would have revealed that they were committing felonies under Illinois and U.S. law.

170.    As discussed in Antonacci's SCOTUS Petition (Case No. 15-1524), attached hereto, the Inquiry Panel's Report is rife with fraud. It is reproduced in the Appendix to the SCOTUS Petition. **(Pet. App. 143a-48 at Ex. A.)**

171.    Major filed the Amended Verified Complaint on April 28, 2013. The Amended Verified Complaint was a far weaker version of the Verified Complaint.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 47 of 117
Case 1:24-cv-00172   Document 1-9   Filed 02/14/24   Page 32 of 101 PageID# 32
PageID# 1155

172.   Mr. Antonacci requested a Hearing Panel to review his application to the Illinois Bar.

173.   On May 6, 2013, Mr. Antonacci indicated to Ms. Regina Kwan Peterson, Director of Administration for the Illinois Board of Admission to the Bar, that the conduct of the Inquiry Panel seemed dubious for the reasons discussed above. Peterson initially agreed, stating "[a]fter reading your email, I understand your concerns." Peterson further advised Mr. Antonacci "the hearing panel is not bound in any way by the Inquiry Panel Report and you may marshal facts or evidence to impeach the credibility of the report."

174.   Mr. Antonacci's Hearing Panel was scheduled for August 14, 2013.

175.   Bronstein acted as Chairman of the Hearing Panel.

176.   Pursuant to Rule 9.3(c) of the Rules of the Illinois Committee on Character and Fitness, Mr. Antonacci requested that the Committee issue subpoenas ("Rule 9.3 Subpoenas"), for testimony and documents, to the following: Patton, Nereim, Sublett, Ponder, Mulaney, Seyfarth, Neal & Leroy, Drinker Biddle LLP, and Quarles & Brady LLP.

177.   The Rule 9.3 Subpoenas sought documents and testimony demonstrating that Gehringer, Nereim, Chicago, Seyfarth, Ponder, Mulaney, Sublett, Walsh, Neal & Leroy, had conspired to harass and intimidate Mr. Antonacci, cause him financial duress by indefinitely postponing his admission to the Illinois Bar, and coerce him into withdrawing the Circuit Court Case.

178.   Except for Quarles & Brady, all recipients of the Rule 9.3 Subpoenas moved to quash those subpoenas.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 48 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 33 of 101 PageID# 33
PageID# 1156

179.    Quarles & Brady complied with the subpoenas by producing Ponder's personnel file from her time as a contract partner there. Ponder's personnel file indicated that she had been fired from both Altheimer & Gray and Quarles & Brady. Ponder's personnel file further revealed that Ponder was expressly deemed "difficult to work with."

180.    After the Illinois Board of Admissions to the Bar served Mr. Antonacci's Rule 9.3 Subpoenas, Chairman Bronstein postponed the Hearing Panel indefinitely.

181.    Bronstein nonetheless convened the Hearing Panel on August 14, 2013, and styled it as a "prehearing conference."

182.    The Hearing Panel did not have any legal authority to quash the Rule 9.3 Subpoenas.

183.    Bronstein convened the prehearing conference so that the Hearing Panel could harass and intimidate Mr. Antonacci in order to coerce him into withdrawing the Rule 9.3 Subpoenas.

184.    Counsel for the Character & Fitness Committee, Mr. Stephen Fedo ("Fedo"), was present at the prehearing conference.

185.    Gerhinger, on behalf of Ponder and Seyfarth, and Lenny D. Asaro ("Asaro"), on behalf of Neal & Leroy, were also present.

186.    Fedo unlawfully disclosed Mr. Antonacci's private Character and Fitness files to Asaro and Gehringer, at the request of Gehringer, Asaro, and Sublett, prior to the prehearing conference.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 49 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 34 of 101 PageID# 34
PageID# 1157

187. The "prehearing conference" of August 14, 2013, lasted approximately three hours, during which time the members of the Hearing Panel attempted to harass and intimidate Mr. Antonacci such that he would withdraw the Rule 9.3 Subpoenas.

188. Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas.

189. Bronstein and the Hearing Panel unlawfully quashed Mr. Antonacci's Rule 9.3 Subpoenas.

190. The unlawful conduct of Defendants and their co-conspirators had prevented Mr. Antonacci from obtaining professional opportunities in Illinois and had further damaged Mr. Antonacci's professional reputation. As a direct result of these injuries, in August 2013, Mr. Antonacci relocated to Washington, D.C., because he is still actively licensed in both the District of Columbia and the Commonwealth of Virginia, and thus he could earn a living there. In 2017, Antonacci became licensed in Maryland as well. To this day, Mr. Antonacci has never been subject to disciplinary action nor has a client ever alleged malpractice against him.

191. On August 1, 2013, Judge William Maddux, former Chief of the Law Division at Cook County Circuit Court, denied Seyfarth's Motion to Seal the Verified Complaint.

192. While Mr. Antonacci was in Washington, D.C., Major indicated to Mr. Antonacci, via electronic mail utilizing interstate communications, that she would not execute Judge Maddux's order and have the seal removed from the Verified Complaint.

193. Via letter dated August 28, 2013, Mr. Antonacci insisted that Major remove the seal from the Verified Major Complaint, and further set forth numerous

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 50 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 35 of 101 PageID# 35
PageID# 1158

undisputed facts demonstrating that Major's position was unfounded and suggested that she was not genuinely advocating on Mr. Antonacci's behalf.

194.    Major responded, via email, that she could no longer represent Mr. Antonacci, and thus she would withdraw her representation after she filed Mr. Antonacci's Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint and that Motion was ruled upon.

195.    Realizing that Major was trying to sabotage his case, Mr. Antonacci terminated Major's representation immediately so that she could not damage his case further with a faulty Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint. Mr. Antonacci proceeded *pro se* in the Circuit Court.

196.    On September 6, 2013, Major sent Mr. Antonacci a letter, to his address in Washington, D.C., via U.S. first class and certified mail, as well as electronic mail, where she falsely claimed that Mr. Antonacci had accused her former associates of fraudulently billing Mr. Antonacci, which he had never done.

197.    On September 20, 2013, Mr. Antonacci requested that Major produce of all of Major's and Major Law's communications with Gehringer and Seyfarth pertaining to his case. Major refused to provide those communications.

198.    Major refused to disclose her email communications with Gehringer and Seyfarth because those communications demonstrate that she was assisting the Defendants by sabotaging Mr. Antonacci's case and fraudulently billing him.

199.    From December 2013 through May of 2015, Major sent Major Law's bills to Mr. Antonacci via U.S. Mail and electronic mail, utilizing interstate communications.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 51 of 117
PageID# 1159
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 36 of 101 PageID# 36

200.    Major sent Mr. Antonacci her legal bills in order to coerce him into accepting Seyfarth's $100,000 settlement offer to pay her legal bills.

201.    On December 5, 2013, Mr. Antonacci presented his Motion for Leave to File Surreply *Instanter* to Judge Brewer. Judge Brewer screamed at Mr. Antonacci erratically throughout the presentment of that motion.

202.    Ms. Peggy Anderson ("Anderson"), on behalf of Toomey, acted as court reporter throughout the proceeding. Anderson took notes on a laptop computer and further made a digital audio recording of the proceeding.

203.    Anderson, Gehringer, and Ms. Sandy Toomey ("Sandy Toomey"), president and principal of Toomey Reporting, agreed and conspired to unlawfully delete portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

204.    In furtherance of the conspiracy, Anderson agreed to provide a false certification that the December 5, 2013 hearing transcript was true and accurate.

205.    In furtherance of the conspiracy, upon information and belief, Anderson, Gehringer, and Sandy Toomey agreed to utilize the U.S. Mail and interstate wires to transmit falsified documents across state lines, and to make material factual misrepresentations regarding the veracity of the transcript and their conspiracy to falsify the same.

206.    At the direction of Gehringer, Anderson deleted portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 52 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 37 of 101 PageID# 37
PageID# 1160

207.    Anderson further deleted those portions of the audio recording at the direction of Gehringer and this criminal enterprise.

208.    On December 6, 2013, Judge Brewer denied Seyfarth and Ponder's motion to dismiss the Amended Verified Complaint, ruling that the defamation *per se* claim may proceed based solely on Mr. Antonacci's allegation that Ponder had falsely accused him of engaging in the unauthorized practice of law. Judge Brewer further invited Seyfarth and Ponder to file a motion to strike every other allegation from the Amended Verified Complaint. Judge Brewer instructed Mr. Antonacci not to object to defendants' motion to strike allegations from the Amended Verified Complaint.

209.    Judge Brewer and Gehringer had conspired to weaken Mr. Antonacci's Amended Verified Complaint by allowing defendants to strike allegations from the Amended Verified Complaint, contrary to well settled Illinois law. Amusingly, Judge Brewer even instructed Mr. Antonacci to not object to defendants' motion to strike allegations from the Amended Verified Complaint so that Mr. Antonacci would waive his right to appeal the striking of those allegations.

210.    On or around December 16, 2013 Mr. Antonacci caused subpoenas *duces tecum*, for documents and deposition testimony, to be served upon the City of Chicago, Patton, and Ms. Jamie Rhee ("Rhee"), Chief of Procurement Services for the City of Chicago (the "Chicago Subpoenas"). The Chicago Subpoenas sought documents and testimony demonstrating the Ponder had defamed Mr. Antonacci to City personnel relating to the DPS Matter.

211.    Realizing that Mr. Antonacci would not allow the defendants to weaken his Amended Complaint further, and that he would seek discovery from the City proving

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 53 of 117
Case 1:24-cv-00172   Document 1-9 Filed 02/14/24   Page 38 of 101 PageID# 38
PageID# 1161

Ponder fraudulent misconduct, on December 20, 2013, Seyfarth and Ponder moved to reconsider Judge Brewer's December 6, 2013 ruling, and to stay execution of the Chicago Subpoenas. Gehringer noticed the motion to reconsider for January 6, 2014.

212.    Gehringer conspired with Patton, Nereim, and City attorney Mr. Michael Dolesh ("Dolesh"), to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

213.    On December 31, 2013 the City of Chicago moved to stay the Chicago Subpoenas. The City also noticed the motion for January 6, 2014.

214.    Judge Brewer was not present at Cook County Circuit Court on January 6, 2014. Concerned that the substitute judge would not stay the Chicago Subpoenas, Gehringer and Dolesh approached Mr. Antonacci and offered an agreed order whereby Mr. Antonacci would narrow the scope of the Chicago Subpoenas, and the City would produce documents voluntarily within approximately two weeks, at which time Mr. Antonacci would determine whether the depositions of Patton and Rhee needed to go forward. Seeking to deal with the City amicably, Mr. Antonacci entered into the agreed order.

215.    Upon information and belief, from December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 54 of 117
Case 1:24-cv-00172    Document 1-3 Filed 02/14/24    Page 39 of 101 PageID# 39
PageID# 1162

216.    During January and February 2013, Dolesh sent Mr. Antonacci numerous emails falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees.

217.    The City never produced documents to Mr. Antonacci or allowed deposition testimony. After Mr. Antonacci had filed amended Chicago Subpoenas, on February 3, 2014, Brewer quashed the Chicago Subpoenas for testimony of Rhee and Patton, and falsely ordered the City to produce documents responsive to the amended Chicago Subpoenas directly to her chambers.

218.    On February 6, 2013, Dolesh sent a letter to Judge Brewer's Chambers, via U.S. Mail, falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees. Dolesh's February 6, 2013 letter also falsely stated that the City was transmitting therewith documents for the court's *in camera* review.

219.    Dolesh transmitted the February 6, 2013 letter to Mr. Antonacci in Washington, D.C. via electronic mail utilizing interstate communications.

220.    The City never transmitted responsive documents to the court for review. Dolesh sent the February 6, 2013 letter solely in furtherance of the conspiracy to conceal evidence of Ponder's malicious fraud.

221.    On or about December 19, 2013, Toomey transmitted the falsified transcript of the December 5, 2013 hearing to Mr. Antonacci, at his residence in the District of Columbia, via U.S. and electronic mail, utilizing interstate communications.

222.    That same day, Mr. Antonacci pointed out the discrepancies in the transcript to Sandy Toomey.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 55 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 40 of 101 PageID# 40
PageID# 1163

223.    On December 19, 2013, Sandy Toomey falsely stated to Mr. Antonacci, via electronic mail utilizing interstate communications, that no changes had been made to the transcript.

224.    On December 20, 2013, Anderson, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C. During this phone conversation, Anderson falsely stated that she did not alter the transcript at the behest of Gehringer and Toomey. Anderson falsely stated that the transcript matched her recollection of the December 5, 2013 proceeding.

225.    When Mr. Antonacci asked Anderson if he could listen to the audio recording, Anderson stated that she would have to check with Toomey regarding their company policy.

226.    On December 20, 2013, Sandy Toomey, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C, and left him a voice message. In her voice message, Sandy Toomey falsely claimed, multiple times, that Anderson's audio recording of the December 5, 2013 hearing transcript had been deleted and could not be retrieved.

227.    The audio recording had not been deleted and was still in the possession of Toomey and Anderson.

228.    In December 2013, Mr. Antonacci served subpoenas ("Toomey Subpoenas") on Toomey and its court reporter seeking documents and testimony demonstrating that Toomey, at the direction of Gehringer, had falsified the December 5, 2013 hearing transcript.

229.    Arnold represented Toomey in the Circuit Court Case.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 56 of 117
Case 1:24-cv-00172   Document 1-9 Filed 02/14/24   Page 41 of 101 PageID# 41
PageID# 1164

230. Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

231. From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy.

232. Brewer quashed the Toomey Subpoenas on February 3, 2014. During the February 3, 2014 hearing, Brewer invited Arnold and Toomey to impose sanctions on Mr. Antonacci for moving to compel the Toomey Subpoenas. Brewer invited Toomey to impose sanctions on Mr. Antonacci in order to intimidate Mr. Antonacci and coerce him into withdrawing the Circuit Court Case.

233. Mr. Antonacci moved for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas.

234. On February 28, 2014, Arnold moved for sanctions against Mr. Antonacci ("Toomey's Motion for Sanctions"). Toomey's Motion for Sanctions misrepresented numerous material facts. Arnold transmitted Toomey's Motion for Sanctions to Mr. Antonacci in Washington, D.C. via U.S. Mail. In furtherance of the conspiracy, and at the direction of Gehringer, Ms. Janet Greenfield transmitted Toomey's Motion for Sanctions to Mr. Antonacci, via electronic mail.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 57 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 42 of 101 PageID# 42
PageID# 1165

235. On March 31, 2014, Judge Brewer ruled during a hearing that she would dismiss the Amended Verified Complaint with prejudice.

236. On April 23, 2014 a hearing was held on Mr. Antonacci's motion for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas, as well as Toomey's Motion for Sanctions.

237. Kruse and Kruse International acted as court reporter for the April 23, 2014 hearing.

238. Judge Brewer blatantly harassed Mr. Antonacci throughout the April 23, 2014 proceeding, such that her actual prejudice was unmistakable. Judge Brewer also made numerous false statements during the hearing in an attempt to conceal Toomey's falsification of the December 5, 2013 hearing transcript.

239. On July 23, 2014, Judge Brewer issued her Final Order ("Final Order") in the Circuit Court Case.

240. The Final Order misrepresented numerous material facts.

241. Gran, on behalf of Judge Brewer, transmitted the Final Order to Mr. Antonacci, at his address in Washington, D.C., via U.S. Mail.

242. Antonacci later perfected an appeal of the Circuit Court Case ("Circuit Court Appeal").

243. While the Circuit Court Appeal was pending, on April 29, 2015, Antonacci filed his complaint in the U.S. District Court for the Northern District of Illinois, alleging RICO and other fraud claims against members of this criminal enterprise. (NDIL Case No. 1:15-cv-3750.)

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 58 of 117
Case 1:24-cv-00172   Document 1-9 Filed 02/14/24   Page 43 of 101 PageID# 43
PageID# 1166

## SHAUN SO AND RICHARD WHEELER

244.    When Antonacci arrived back in DC after filing the federal complaint in Chicago, a local political lawyer who Antonacci has known for many years, and who worked with Leslie Kiernan in the Obama Administration, introduced Antonacci to Shaun So and Richard Wheeler, principals for Storij.

245.    Antonacci was introduced to So and Wheeler under the false pretense that Storij needed legal assistance with its government contracts work.

246.    So and Wheeler had served in the Army together doing intelligence work.

247.    Specifically, Wheeler worked in signals intelligence and has expertise hacking, infiltrating, and exploiting computer systems and mobile devices.

248.    So's expertise is human intelligence and interrogation.

249.    So and Wheeler are part of this enterprise.

250.    Shortly thereafter, Storij retained Antonacci's law firm, Antonacci PLLC f/k/a Antonacci Law PLLC, for legal services pertaining to its government contracts work.

251.    Antonacci Law provided legal services to The So Company from 2015 through 2021.

252.    The So Company never sent Antonacci Law a U.S. tax form 1099, but So, Wheeler, and other So Company "employees" regularly utilized U.S. mails and interstate wires to perpetuate the fraudulent scheme orchestrated by this enterprise.

253.    The enterprise uses So and Wheeler to keep tabs on Antonacci and stay apprised of his plans regarding his federal lawsuit against the enterprise, his law business

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 59 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 44 of 101 PageID# 44
PageID# 1167

and his clients, and his personal contacts and his perspective on his relationship with Livya. So specifically cultivated a personal relationship with Antonacci in order to do so.

254.    In 2017, Antonacci helped to save So's life when So broke his leg while they were winter mountaineering in the Adirondacks. They did a triathlon together in 2019.

255.    The enterprise uses Wheeler to illegally infiltrate and exploit Antonacci's protected computer systems and mobile phone, as further described below.

### ANTONACCI'S FEDERAL CASE IN ILLINOIS

256.    Six days after Antonacci filed his federal complaint against this enterprise, on May 5, 2015, district judge Milton I. Shadur, dismissed Antonacci's complaint, *sua sponte*, for lack of subject matter jurisdiction, and entered judgment.

257.    Antonacci filed his notice of appeal on June 2, 2015 ("Seventh Circuit Case"). (Appellate Case No. 15-2194.)  None of the Respondents filed a cross-appeal.

258.    On July 27, 2015, the Seventh Circuit issued an order striking Antonacci's brief for failing to identify "by name" each member of Neal & Leroy LLC and Perkins Coie LLC, as well as each partner of Seyfarth Shaw LLP, and the state of citizenship of each member or partner thereof.

259.    The Seventh Circuit ordered Antonacci to file a new brief, by July 31, 2015, that conformed with this requirement.

260.    On August 5, 2015, the respondents in the Seventh Circuit Case jointly moved for a 35-day extension of time to file their Briefs of Appellee, which was granted the very next day.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 60 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 45 of 101 PageID# 45
PageID# 1168

261. Eleven days later, the Illinois Appellate Court issued its opinion in the Circuit Court Appeal ("Illinois Appellate Opinion"), without oral argument.

262. The Illinois Appellate Opinion is rife with indisputably false statements seeking to protect this enterprise and damage Antonacci's legal career. The Illinois Appellate Court Opinion contradicts itself – and orders of the Circuit Court – with its treatment of facts throughout its opinion. (*See* **Antonacci SCOTUS Pet. at 22, Ex. A.**)

263. Antonacci's petition for leave to appeal to the Illinois Supreme Court details the calculated, false statements of fact made by the Illinois Appellate Court in support of this enterprise. **(Pet. App. 279a-81a, Ex. A.)**

264. The Seventh Circuit delayed Antonacci's Appeal so that the Illinois Appellate Court could issue its fraudulent opinion to bolster the position of the respondents in the Seventh Circuit Case.

265. On November 24, 2015, the Seventh Circuit issued its order scheduling oral argument in Antonacci's federal case for January 26, 2016.

266. On November 25, 2015, the Illinois Supreme Court issued its order denying Antonacci's Leave to Appeal the Illinois Appellate Court Opinion.

267. In March of 2016, the Seventh Circuit affirmed the district court's ruling that it did not have subject matter jurisdiction over Antonacci's RICO complaint.

268. Also in March of 2016, Gehringer was elevated to General Counsel of Perkins Coie.

269. Around the same time, Gehringer, on behalf of Perkins Coie, engaged Fusion GPS on behalf of the "DNC and Hilary for America" to provide a disinformation campaign, with the assistance of various intelligence agencies under the control of

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 61 of 117
Case 1:24-cv-00172   Document 1-9 Filed 02/14/24   Page 46 of 101 PageID# 46
PageID# 1169

President Barack Obama, Emanuel's former boss, to falsely associate President Trump with Russian election interference. (**Oct. 27, 2017 Ltr. from M. Gehringer to W. Taylor, <u>Ex. B</u>.**)

270.    Perkins Coie and Gehringer also engaged Fusion GPS to provide a disinformation campaign concerning Antonacci to undermine his reputation and prevent him from gaining professional opportunities.

271.    Perkins Coie and/or other Defendants and/or other unknown co-conspirators, have engaged, and continue to engage, FTI, Fusion GPS and Rokk to provide a disinformation campaign(s) concerning Antonacci.

272.    Antonacci petitioned SCOTUS for writ of certiorari. (**No. 15-1524, <u>Ex. A</u>**). That writ was denied in October 2016.

### DERRAN EADDY

273.    On September 23, 2016, shortly before Antonacci's SCOTUS writ was denied, he was having dinner outside at The Royal restaurant, in the Shaw neighborhood of Washington, DC, with some "friends" and Livya, who was six-months pregnant at the time. Their table was on the sidewalk abutting the restaurant.

274.    Antonacci had an flight to Germany the following morning.

275.    While they waited for their food, Eaddy ran up to their table and started repeatedly screaming "YOU'RE ALL PRIVILEGED WHITE PIECES OF SHIT!" Eaddy began pointing at individuals at the table screaming: "YOU'RE A PRIVILEGED WHITE PIECE OF SHIT! YOU'RE A PRIVILEGED WHITE PIECE OF SHIT!..." until he put his finger right in Livya's face – who, again, was six-months pregnant at the time – and screamed "YOU'RE A PRIVILEGED WHITE PIECE OF SHIT!"

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 62 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 47 of 101 PageID# 47
PageID# 1170

276.   At that point, concerned for Livya's safety, Antonacci jumped up and pursued Eaddy, who immediately pulled out his phone and started recording Antonacci.

277.   Eaddy was race-baiting Antonacci, hoping to capture Antonacci on video shouting racial slurs at Eaddy, who is African-American. Antonacci is not racist, despite this enterprise's desire to defame him, and thus he did not take Eaddy's bait.

278.   After a couple minutes running up and down Florida Avenue NW, Eaddy put his phone away and said to Antonacci "I'M GONNA KILL YOU!" At that point, Eaddy punched Antonacci in the nose. Antonacci immediately wrestled Eaddy to the ground. Eaddy then began trying to gouge out Antonacci's eyes. Antonacci got Eaddy into position and began punching Eaddy in the head, when suddenly several DC Metro police officers appeared and pulled Antonacci off of Eaddy and threatened to arrest him.

279.   Because the windows were open at The Royal restaurant, several witnesses corroborated Antonacci's account that Eaddy was the aggressor who assaulted their table unprovoked. Eaddy was arrested and charged and convicted of simple assault and battery and received a suspended sentence based on his alleged psychological problems.

280.   Despite Antonacci's urging to the AUSA in charge of the case (who changed numerous times), Eaddy was not charged with a hate crime.

281.   Eaddy is a middle-aged strategic communications professional with a master's degree. According to his website, he represents VA contractors' interests on Capitol Hill: www.derraneaddy.com

282.   Eaddy is married to white woman.

283.   By Eaddy's own admission, Eaddy intended to kill Antonacci.

284.    The Defendants paid or otherwise incentivized Eaddy to attempt to murder Antonacci, assault and race-bait him.

285.    Eaddy received additional work representing VA contractors in exchange for his criminal acts.

## DEFAMATION STRATEGY AFTER SCOTUS PETITION WAS DENIED

286.    After Antonacci's petition for writ of certiorari was denied, he believed that the enterprise alleged in his federal case was done with their campaign to destroy him. He was wrong, and has since realized the extent and nature of this criminal enterprise.

287.    Antonacci and Livya had a child, A. G. A., on December 15, 2016. (*See* **Nov. 11, 2022 paternity test results, Ex. C.**) Antonacci had another paternity test done before he married Livya, which retuned the same result. That test was done with Livya.

288.    Antonacci and Livya had another child, S. P. A., on October 14, 2019. (*See* **Nov. 11, 2022 paternity test results, Ex. C.**)

289.    On November 23, 2016, Antonacci won an appeal from the Circuit Court of Arlington County to the Supreme Court of Virginia, reinstating his client's jury verdict. *See Medlin & Son Construction Co., Inc. v The Matthews Group, Inc.*, Va. Record. No. 160050 (Nov. 23, 2016).[1]

290.    Antonacci and Livya bought a condo in the Petworth neighborhood of Washington, DC, which they still own jointly, in December of 2016.

291.    In September of 2017, Antonacci and Livya were married. On June 12, 2023, they were divorced.

---

[1] Available at https://www.vacourts.gov/courts/scv/orders_unpublished/160050.pdf

292.   In September of 2018, Antonacci traveled to Chicago to meet Stephen J. Lombardo III ("Lombardo"), an old family friend.

293.   Lombardo attended Georgetown for his undergraduate degree and for law school.

294.   Lombardo worked for Katten Muchin Zavis Rosenman LLP in Chicago for several years, doing transactional work, before going to work for his father's Gibsons restaurant group as Chief Operating Officer.

295.   Antonacci's father had worked for Lombardo's father at Chicago-area restaurants when they were younger, so Antonacci and Lombardo have known each other their whole lives.

296.   Antonacci worked as a waiter for a Gibsons affiliate in Rosemont, Illinois prior to attending law school.

297.   Antonacci traveled to Chicago to determine whether Gibsons was exploring business opportunities in the DC area and if Antonacci could provide legal assistance.

298.   Rather than work with Antonacci, Lombardo agreed to assist the criminal enterprise, through Emanuel, in its attempt to destroy Antonacci and his legal career.

299.   Lombardo agreed to assist the enterprise in exchange for a partnership with the Think Food Group, Inc.

300.   Paul Kiernan and Holland & Knight represented Think Food Group, Inc. when it was sued for breach of its lease with the Trump Hotel.

301.   Gibsons is currently working to open at least two restaurants associated with the Think Food Group.

302.     In exchange, Lombardo connected the enterprise with his Georgetown classmate, Firmender. Firmender and Lombardo played baseball together at Georgetown. Firmender is the General Counsel of Lane.

303.     Upon graduating from the University of Colorado Law School, Firmender hung a shingle practicing family law in Denver for several years.

304.     Firmender went from solo-practice family lawyer to General Counsel of a publicly-traded construction company overnight.

305.     Because this enterprise protects Firmender and other members of from any accountability, he agreed to orchestrate dubious claims against Lane's architect, while setting up Antonacci for a false claims act investigation associated with Antonacci's representation of Lane ("AECOM Fraud").

306.     To be clear, Antonacci does not know whether Firmender actually received any funds from the AECOM Fraud. Firmender may have simply perpetrated the AECOM Fraud out of loyalty to the enterprise that gave him the position he is not qualified for, and with it the prestige he never earned.

307.     This is why this enterprise promotes people who are politically compromised or otherwise unqualified for positions they hold – because it buys loyalty. The Chicago court system is a prime example of this, as evidenced in Antonacci's SCOTUS petition.

308.     As will be further discussed below, Firmender deliberately sought to sabotage Lane's case and implicate Antonacci in the pursuit of Lane's dubious claims, utilizing interstate wires, follows:

a. Lane's position regarding a key legal issue changed suddenly right before the relevant hearing, and one of Lane's employees allegedly destroyed an unknown number of documents, which Lane could not explain.

b. Lane's IT department further sought to falsely associate Antonacci with that employee's data collection efforts, and further refused to articulate its data preservation policies.

c. Some key employees implicated in the mysterious acts left the firm shortly before AECOM's complaint was filed, which was orchestrated by Firmender.

d. Firmender inexplicably delayed hiring both the consultant tasked to audit Lane's backcharge, Deloitte, and the firm tasked to collect and process Lane's discovery, Epiq.

e. And once Epiq was hired and Antonacci had trained all the contract attorneys, Firmender inexplicably ordered Epiq to stop work multiple times, particularly after Antonacci brought new evidence to Lane's attention.

309. In short, even if Firmender did not steal any government money and/or attempt to defraud AECOM, he went out of his way to make it look like he did. And in a way that was obviously meant to implicate Antonacci.

310. Around the same time, Anthony J. Antonacci ("Tony Antonacci"), Antonacci's younger brother, agreed to assist the enterprise in exchange for funding and promotion of his up his soon-to-be restaurant, Pennyville Station, in Park Ridge, Illinois, where the Antonaccis grew up.

Case 1:24-cv-00172-MSN-LRV     Document 91-2     Filed 04/10/24     Page 67 of 117
Case 1:24-cv-00172     Document 2  Filed 02/14/24     Page 52 of 101 PageID# 52
PageID# 1175

311.   All the previous ventures of Tony Antonacci and his father, Tino Antonacci, had failed completely and their investors lost over $10,000,000 in the aggregate, and Tino Antonacci lost what little savings he had.

312.   Louis Antonacci had even set them up with a venture capitalist, who lost over $1,000,000 investing in Tony and Tino Antonacci's ice cream cone venture.

313.   Tony Antonacci was expelled from Loyola Academy High School after his first year there, and later dropped out of Maine Township High School South after failing all of his classes. Tony Antonacci went to work for his father, Tino Antonacci, in his Chicago restaurant, Basta Pasta, after dropping out of high school. After Tino Antonacci sold Basta Pasta in or about 2003, Tony stayed on to work for the buyer, but the restaurant failed shortly thereafter.

314.   Tony Antonacci, who has been destitute most of his adult life and living off the charity of his wife's family, agreed to actively defame Louis Antonacci to patrons at his restaurant and everyone else in Park Ridge and Chicago who knows Louis Antonacci.

315.   Louis Antonacci was the first person in his family to graduate from college.

316.   Louis Antonacci is the only lawyer in his family's history.

317.   Tony Antonacci was compelled to seek treatment for numerous behavioral and psychological disorders before he dropped out of high school.

318.   In his late 50s, after ignoring Louis Antonacci's advice to Tino Antonacci that he invest his proceeds from the sale of Basta Pasta and get a job for a decade so he

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 68 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 53 of 101 PageID# 53
PageID# 1176

could retire, Tino Antonacci spent the proceeds trying to launch a company that manufactured and sold ice cream cones.

319.    After losing his house and depleting his savings, Tino Antonacci moved back in with his parents in his early 60s. He now works for Tony Antonacci.

320.    Tino and Tony Antonacci's financial situations made them easy for this enterprise to exploit.

321.    Louis Antonacci went to college and law school and sought a career through education and developing skills, so Tino and Tony Antonacci resent him for gaining opportunities that they do not have. By demonizing Louis Antonacci as some sort of out-of-touch "elite," because he sought to educate himself, it is easy for Tino and Tony Antonacci to feel good about helping this enterprise attack Antonacci's career, because he is not like them and they cannot understand the work he does.

322.    This is typical of the class warfare that accompanies declining empires like contemporary America:

> [THE   BIG   CYCLE   OF   INTERNAL   ORDER   AND DISORDER]
>
> Watch populism and polarization as markers. The more that populism and polarization exist, the further along a nation is in Stage 5, and the closer it is to civil war and revolution. In Stage 5 [very bad financial conditions and intense conflict], moderates become the minority. In Stage 6 [civil war/revolution], they cease to exist.
>
> + Class Warfare
> In Stage 5, class warfare intensifies. That is because, as a rule, during times of increased hardship and conflict there is an increased inclination to look at people in stereotypical ways as members of one or more classes and to look at these classes as either being enemies or allies. In Stage 5, this begins to become much more apparent. In Stage 6, it becomes dangerous.
>
> Dalio, Ray, PRINCIPLES FOR DEALING WITH THE CHANGING WORLD ORDER: WHY NATIONS SUCCEED AND FAIL, 173, New York, NY,

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 69 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 54 of 101 PageID# 54
PageID# 1177

Avid Reader Press (2021).

323.    Besides defaming Antonacci to people in Chicago, this enterprise also uses Tino and Tony Antonacci in an attempt to shield itself from defamation claims. They do this by spreading lies about Antonacci with the caveat that "Antonacci's brother (or father) said [lie] about [Antonacci]." The fact that Louis Antonacci's family members said the lie is a true statement of fact, thus giving the enterprise a basis for shielding themselves from a defamation claim, and further bolsters the credibility of the lie in question, because one's family members tend to care about them and know them better than other people.

324.    Some of Tino and Tony Antonacci's defamatory claims are as follows:

a.    Tino and Tony Antonacci falsely claim that Louis Antonacci failed the Illinois Bar exam (Louis Antonacci has never failed any bar exam).

b.    Tino and Tony Antonacci falsely claim that Livya was previously married to a partner at Holland & Knight.

c.    Tino and Tony Antonacci falsely claim that Livya left Louis Antonacci.

d.    Tino and Tony Antonacci falsely claim that Louis Antonacci is or was abusive towards Livya.

e.    Tino and Tony Antonacci falsely claim that Louis Antonacci is misogynistic, bigoted, and homophobic (Anita Ponder is an African-American woman, so this enterprise defames Antonacci by spreading the lie that Antonacci sued her for that reason.)

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 70 of 117
Case 1:24-cv-00172    Document 1   Filed 02/14/24   Page 55 of 101 PageID# 55
PageID# 1178

f.     Tino and Tony Antonacci falsely claim that Louis Antonacci did not first leave Livya in December of 2020.

g.     Tony Antonacci falsely denies that Louis Antonacci told him that he was leaving Livya in October of 2020.

h.     Tino and Tony Antonacci falsely claim that Louis Antonacci has a history of mental health problems.

325.    In fact, Louis Antonacci has never had any mental health problems.[2] He was a successful student and a very successful lawyer before he exposed the fraudulent law practice of one crooked lawyer, Katz. And that turns out to be standard business operations for this enterprise, which is shockingly administered by officers of the court.

326.    In contrast, Tony Antonacci was repeatedly compelled to seek mental and behavioral healthcare until he dropped out of high school – after failing all of his classes – to work for his father.

327.    In Antonacci's experience, this enterprise frequently accuses its enemies (which it bizarrely creates out of fear and spite, betraying its inherently self-defeating nature) of its own inadequacies and misconduct, thereby projecting it onto others and distracting from its own failings and malicious behavior.

328.    The purpose of this defamation campaign is to ensure that Louis Antonacci receives no legal work or employment/business opportunities from his network, and it makes the malicious acts of the enterprise seem justified, allowing them to maintain and gain political support.

---

[2] Louis Antonacci believes he may have a form of autism, although no medical professional has ever diagnosed that.

## LANE CONSTRUCTION AND THE AECOM FRAUD

329.    In early September of 2019, Lombardo indicated to Antonacci, via interstate phone calls and text, that he had become aware of a position with U.S. Department of Justice's Oversight Section in the Office of Intelligence in its National Security Division.

330.    Antonacci's experience fighting his racketeering case in Chicago was, in his view, highly relevant to the oversight position in DOJ's Office of Intelligence, and thus he highlighted that experience in his cover letter to Aprel Thompson applying for the position. Antonacci further attached his SCOTUS petition to his application. (*See* **L. Antonacci Sept. 12, 2019 Ltr. to A. Thompson, Ex. D.**) Antonacci's application was denied.

331.    Relatedly, Antonacci has applied to hundreds of jobs, all over the country and world, over the past 14 years, all of which have been denied (except Seyfarth). This enterprise has prevented Antonacci from obtaining secure employment, through widespread defamation and paying off everyone in his personal and professional networks, in order to keep him trapped.

332.    The enterprise saw Antonacci's application to DOJ as a direct threat to their activity, so it set the AECOM Fraud in motion.

333.    Lane was referred to Antonacci through another Lane outside counsel who regularly represents Livya's employer in litigation.

334.    And, as stated above, Wheeler and So monitored Antonacci by illegally hacking into his computer system and/or mobile phone. This information was passed to

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 72 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 57 of 101 PageID# 57
PageID# 1180

Firmender and Mancini, so they understood Antonacci's progress, strategy and outlook throughout the case.

335.    Lane retained Antonacci Law in October of 2019.

336.    The AECOM Fraud centered around Lane's alleged backcharge against AECOM Technical Services, Inc., its design subcontractor on the 395 Express Lanes Project in Northern Virginia (the "Project").

337.    The AECOM Fraud was premeditated and agreed between Firmender and AECOM's counsel, David Mancini of Troutman Pepper Hamilton Sanders LLP. Firmender assured Mancini that his client would be satisfied with the outcome of the suit because Firmender could agree to settle it at any time. Antonacci was the target of the AECOM Fraud.

338.    Judge Mann was elevated to the Supreme Court of Virginia in August of 2022.

339.    The Project was a public-private partnership. Transurban LLC ("Transurban") acted as the Project Owner.

340.    In furtherance of this fraudulent scheme, Lane hosted several meetings with Antonacci at Lane's Project offices in Springfield, VA.

341.    In furtherance of this fraudulent scheme, and utilizing interstate wires, a Lane Project engineer further invited Antonacci to Lane's Chantilly, VA office to give Antonacci two thumb drives containing data that Lane hoped would implicate Antonacci in the AECOM Fraud.

342.    Lane asked Antonacci for a legal analysis of its backcharge against AECOM.

343.   Antonacci sought Lane's express clarification on a number of relevant issues regarding Lane's proposed backcharge prior to providing his legal analysis.

344.   Most notably, Lane had settled all of its claims against Transurban in July of 2019 (the "Owner Settlement"). Because Firmender had orchestrated turnover of Lane employees involved in the Owner Settlement, there was some alleged confusion as to whether the Owner Settlement had included AECOM's claims, which Lane purports to have indicated to AECOM it would pass through to the Owner.

345.   Lane indicated to Antonacci that the Owner had taken the position, pursuant to the Owner Settlement, that AECOM's claims were untimely and Lane's $5,000,000 settlement payment was for weather delays that had impacted Lane.

346.   David Mancini requested a copy of the Owner Settlement from Antonacci, which by its terms was confidential. In correspondence with Transurban's counsel, Antonacci requested that the Owner waive the confidentiality provisions of the Owner Settlement so that he could provide it to AECOM. Transurban refused that request.

347.   After Lane provided the express clarifications requested by Antonacci, Antonacci provided his legal analysis.

348.   In June of 2020, Lane and AECOM spent two days in mediation at the offices of Troutman Pepper Hamilton Sanders LLP, who represented AECOM.

349.   The mediation at Troutman was a staged event meant only to attempt to implicate Antonacci in the AECOM Fraud. The mediator did not even begin exchanging numbers until after lunch on the second day of a two-day mediation. The parties had no intent of settling at mediation, but rather to wait until the election to see if Biden won, in

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 74 of 117
PageID# 1182
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 59 of 101 PageID# 59

which case the enterprise's control of DOJ would allow them to perpetrate the AECOM Fraud with impunity.

350.    After mediation failed, and a lawsuit by AECOM seemed likely, Antonacci insisted that they hire an outside consultant to analyze the amount sought in the backcharge for allowability, allocability, and reasonableness. Lane and Antonacci Law hired Deloitte LLP to perform this analysis.

351.    Lane was served with AECOM's complaint, which was filed in Fairfax County Circuit Court, on November 17, 2020, once it was clear that President Biden had won the election. (Civil No. 2020 18128.)

352.    President Biden is affiliated with this enterprise.

353.    Lane was served with AECOM's complaint on December 8, 2020.

354.    Antonacci's Law filed some pre-answer motions on Lane's behalf, including a plea in bar, which sought to dismiss many of AECOM's claims as untimely under Virginia law, consistent with Lane's position in mediation.

355.    Prior to the complaint being filed in Fairfax, a number of Lane's employees, who had worked with Antonacci in analyzing the case before and after mediation, left Lane to work for other companies.

356.    After President Biden took office and the political appointees controlling U.S. intelligence agencies changed, Shaun So asked Antonacci to have a Zoom videoconference with So and Wheeler.

357.    During this videoconference, Wheeler violated federal law to infiltrate Antonacci's computer and mobile phone. Wheeler did this so that the enterprise could

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 75 of 117
PageID# 1183
Case 1:24-cv-00172   Document 1-9   Filed 02/14/24   Page 60 of 101 PageID# 60

monitor Antonacci's activities and behavior, via his computer's cameras and audio, while he worked on the Fairfax Circuit Court Case, and after.

358.    Alternatively, the enterprise provided false, incomplete, and/or misleading information about Antonacci to relevant authorities and/or intelligence agencies in order to obtain a warrant allowing Wheeler and So to monitor Antonacci.

359.    Wheeler, and/or other members of this criminal enterprise have continued illegally infiltrating and monitoring Antonacci and Antonacci PLLC. *See generally,* Robert J. Deibert, *The Autocrat in Your iPhone: How Mercenary Spyware Threatens Democracy,* 102 Foreign Affairs, 1, 72 (2023).[3]

360.    As indicated above, Mancini omitted key contract documents from AECOM's complaint. The enterprise had hoped that Antonacci would not notice these omissions.

---

[3] "Bringing together a largely unregulated industry with an invasive-by-design digital ecosystem in which smartphones and other personal devices contain the most intimate details of people's lives, **the new technology can track almost anyone, anywhere in the world.**"

"Providing the ability to clandestinely infiltrate even the most up-to-date smartphones—**the latest "zero click" version of the spyware can penetrate a device without any action by the user—Pegasus** has become the digital surveillance tool of choice for repressive regimes around the world."

"**For Israel, which approves export licenses for NSO Group's Pegasus**, the sale of spyware to foreign governments has brought new diplomatic clout…"

"A **global market for spyware** also means that forms of surveillance and espionage that were once limited to a few major powers are now available to almost any country, and potentially to **even more private firms.** Left unregulated, the **proliferation of this technology threatens to erode many of the institutions, processes, and values on which the liberal international order depends.**"

"Like soldiers of fortune, advanced spyware companies tend to put revenues ahead of ethics, selling their products without regard to the politics of their clients—giving rise to the term "mercenary spyware"—and like military contractors, **their dealings with government security agencies are often cloaked in secrecy to avoid public scrutiny.** Moreover, just as military contractors have offered **lucrative private-sector careers for veterans of military and intelligence agencies, spyware firms and government security services have been building similarly mutually beneficial partnerships, boosting the industry in the process.**"

361.    Antonacci would have seen this as a typical litigation tactic, but when Antonacci hired a process server to file the complete contract with Lane's Motion Craving Oyer, his process server not only failed to file the contract documents with the Fairfax County clerk's office, but further failed to indicate as much to Antonacci when Antonacci spoke to the process server later that day. (*See* **Antonacci Ltr. to Fairfax Clerk's Office, Ex. E.**)

362.    Shortly after Antonacci received his copy of the allegedly filed documents, he saw that, instead of having a file stamp from the clerk's office, the documents had a stamp indicating that they had been received by judicial chambers (which looks very similar to the clerk's stamp).

363.    This enterprise utilized interstate mails and wires to communicate to the process server that he should not file the documents with the clerk's office, but rather with judicial chambers, in order to prejudice Antonacci's case and give Lane a basis to allege legal malpractice against Antonacci.

364.    Fortunately, Antonacci quickly noticed and resolved the issue.

365.    Pursuant to discovery requests served by AECOM, Lane hired Epiq eDiscovery Solutions ("Epiq") to collect and analyze Lane's data. Antonacci managed Epiq's review, through approximately 60 contract attorneys, of hundreds of thousands of documents.

366.    While Epiq sought to collect the laptops of relevant custodians, a Lane in-house lawyer working at the behest of Firmender, Mr. Allen Wiggins, indicated to Antonacci that a former Lane employee had deliberately destroyed data on some of those laptops. Wiggins denied any knowledge as to how or why this had occurred.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 77 of 117
Case 1:24-cv-00172   Document 1-9  Filed 02/14/24   Page 62 of 101 PageID# 62
PageID# 1185

367.    When Antonacci sought clarification from Lane regarding its document preservation policies and why the data had been destroyed, Lane's IT Department, at the behest of Firmender, sought to falsely associate Antonacci with Lane's destruction of documents. Antonacci promptly corrected Lane. (*See* **2021 email correspondence, Ex. F.**)

368.    On June 16, 2021, not long before the hearing on the plea in bar was scheduled, while Antonacci was performing quality control review of the documents deemed responsive by the contract attorneys, he found some correspondence by a previous project manager, who had worked on the Project before Antonacci had been retained, that contradicted Lane's stated position regarding the Owner Settlement.

369.    Antonacci asked Lane to hire the former project manager as a consultant so that Antonacci could interview him via teleconference, which was scheduled for June 23, 2021.

370.    The following day, on June 17, 2021, Firmender ordered all effort on the case halted, including the work of all the contract attorneys that Antonacci had trained, so that no further review of Lane's documents could occur.

371.    Immediately preceding the teleconference with Tracy, Tracy sent Antonacci a memorandum that confirmed Antonacci's concern regarding the Owner Settlement, which was further confirmed during the call.

372.    Because Antonacci was concerned about Lane's position concerning AECOM's claims, as well as Lane's backcharge, and its potential destruction of documents, Antonacci withdrew Lane's plea in bar on July 12, 2021.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 78 of 117
Case 1:24-cv-00172    Document 19 Filed 02/14/24    Page 63 of 101 PageID# 63
PageID# 1186

373. Antonacci was also concerned that the Fairfax County Judge presiding over the case, Judge Thomas Mann, who, in a departure from Fairfax County Circuit Court's normal procedures, had been assigned to preside over the entire case from the outset, was assisting this enterprise and would use the evidence presented by Antonacci at the hearing against Lane, thus providing Lane a basis for a legal malpractice claim.

374. Notably, Mann denied every motion and request Antonacci presented to the court up to that point. Mann even denied Lane's Motion Craving Oyer after there was indisputable evidence that Mancini had omitted thousands of key contract documents from AECOM's complaint.

375. Mann granted every motion and request made by AECOM (Mann did deny AECOM's motion to strike Lane's plea in bar, but Antonacci's pursuit of Lane's plea was integral to the AECOM Fraud, so Mancini only filed that motion, which has no basis in Virginia civil procedure in any case, in order to give Judge Mann an opportunity to appear impartial).

376. Mann was elevated to the Supreme Court of Virginia in August of 2022.

377. Antonacci asked Lane to seek separate counsel to proceed with the matter.

378. Because Antonacci withdrew its plea in bar on behalf of Lane, Lane was required to Answer the last count of AECOM's complaint, and thus would be required to file its counterclaim, if any. Antonacci therefore raised his concerns regarding the new information concerning the Owner Settlement and document destruction with Firmender. (*See* email correspondence, Ex. G.)

379. Immediately after Antonacci raised his concerns, Firmender asked Antonacci to cease working on the case immediately and sought to minimize Antonacci's

bills for work performed, which Lane, pursuant to Firmender's direction, had delayed payment for months.

380.    At the time Antonacci raised his concerns about Lane's positions to Firmender, Lane owed Antonacci Law over $230,000 in past legal due bills, in breach of its contract with Antonacci Law. That amount does not include how much Lane owed Deloitte at the time.

381.    Lane immediately retained Shapiro, Lifschitz & Schram LLP ("SLS"), a Washington, DC, law firm, despite the fact that not one attorney at SLS was licensed in Virginia at the time.

382.    A VA licensed attorney joined the firm shortly after and entered appearance on behalf of Lane.

383.    Antonacci withdrew as counsel of record, and, according to Lane, the case settled immediately after.

384.    In January of 2022, Antonacci received an audit request from KPMG S.p.A. in Milan, Italy, who audits Lane's parent company, WeBuild S.p.A. ("Webuild").

385.    Antonacci notified Firmender of the request, who repeatedly and adamantly requested that Antonacci not respond because Lane's matters with Antonacci Law had settled. (*See* **Jan. 2022 email correspondence, Ex. H.**)

386.    Antonacci notified Livya of his intent to respond to the audit letter, which needed to be received by Webuild by close of business in Milan on Monday, January 31, 2022, so around 9am EDT.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 80 of 117
Case 1:24-cv-00172   Document 1   Filed 02/16/24   Page 65 of 101 PageID# 65
PageID# 1188

387.    On the Sunday before the response was due, Antonacci spent most of the afternoon working from home on his response because he would not have much time in the morning before he and Livya took their children to separate schools/daycare.

388.    That evening, Livya repeatedly asked Antonacci when he would stop working so they could relax together. When he finally stopped working, she asked him whether he had finished the letter. Antonacci responded that he had not, but would get up early to finish it before emailing to Milan.

389.    Antonacci had finished the letter and had set his email account to send it automatically the following morning.

390.    Around 1am on January 31, 2022, Livya woke Antonacci saying that she had severe back pain and urinary distress. He got the kids up and rushed them and Livya to the emergency room at Washington Hospital Center.

391.    Antonacci and the children sat in the waiting room for hours while Livya was with the doctors.

392.    She came out around 5am, saying that the doctors had indicated her symptoms may have been caused by a kidney stone, which she may have passed in the bathroom at home because she was feeling fine, but it was impossible to diagnose with certainty, save maybe a CAT scan. Antonacci went home and put the children back to bed while Livya waited at the hospital to be discharged. (*See* **Jan. 31, 2022 email correspondence, Ex. I.**)

393.    The audit response letter was sent via email the morning of January 31, 2022. (**Ex. J.**)

394.    Antonacci separated from Livya in May of 2022 after selling their primary residence. He moved to Alexandria, Virginia and is currently a resident here.[4]

395.    So, Wheeler, and Storij continued perpetrating their fraudulent scheme in relation to Storij's alleged government contracts work, via emails and text messages, through May of 2022.

396.    In June of 2022, after running a marathon in Ventura, California, Antonacci stopped in Chicago unannounced before his return to Alexandria, Virginia. Antonacci went to Gibsons to talk with Lombardo, and later Pennyville Station to talk with Tony Antonacci (Tino Antonacci refused to see him). Their evasive and contradictory responses to Antonacci's questions satisfied Antonacci that they are working with this enterprise to discredit him and destroy his legal career.

397.    Antonacci filed for divorce from Livya on December 1, 2022, in the Superior Court of the District of Columbia.

398.    DC Superior Court Judge Veronica Sanchez, a Biden appointee, granted Livya's motion to strike allegations from Antonacci's Verified Answer to Livya's Counterclaim.

399.    Striking allegations and sealing complaints is a key tactic used by this enterprise. In the Katz Fraud case, Katz moved to strike hundreds of relevant allegations from Holland & Knight's complaint, which this Court denied. In Antonacci's State Court Case against Ponder and Seyfarth, the Defendants had Antonacci's complaint sealed, and after Antonacci fought for an order to have it unsealed, Major refused to perform the administrative task of having the complaint unsealed, which Antonacci had to do himself

---

[4] Antonacci had first moved out of their house in December of 2020, obtained a lease offer for an apartment in DC, and stayed at a hotel for a week while drafting Lane's responsive pleadings to AECOM's complaint.

after firing her. This is just one of many ways this enterprise seeks to conceal evidence of its criminal operations.

400. On April 5, 2023, Antonacci formally terminated Antonacci PLLC's service agreement with Lane.

401. In May of 2023, a representative of Lane, on behalf of Firmender, called Antonacci to inquire as to his billing practices and client base. Antonacci ended the call quickly.

402. Antonacci and Livya were divorced on June 12, 2023.

403. On December 8, 2023, Antonacci PLLC formally terminated its service agreement with Storij, though he has not done any work for Storij since 2021.

404. After Antonacci opened this action in PACER, but before filing this complaint, Gehringer seems to have left Perkins Coie. (*See* **Antonacci Ltr. to Bates Larson ("Larson"), General Counsel of Perkins Coie, Ex. K.**) Larson was co-counsel with Gehringer in Antonacci's State Court Case in Chicago. Antonacci will reiterate that Gehringer was the architect of the enterprise's criminal conspiracy against Antonacci in Chicago. The fact that Gehringer suddenly fled Perkins Coie, once he got word of this action being initiated, betrays his and Perkins Coie's complicity in the ongoing acts of this enterprise, particularly here in this Commonwealth.

405. The Defendants have been collecting and fabricating opposition research on Antonacci at all times relevant to these proceedings. To that end, this enterprise has had numerous people make video and audio recordings of Antonacci, and take pictures, which it uses to make deepfakes of Antonacci, where it fabricates things he has done and

said, and takes statements and actions out of context, that it collects and disseminates to further defame Antonacci.

### COUNT I: Violation of Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1962 (a), (b), and (c))
### (All Defendants)

406.    Antonacci incorporates all of the preceding paragraphs as if they were fully set forth herein.

407.    The association-in-fact of all Defendants named in this Complaint, together with the others described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

408.    Specifically, the enterprise is an association-in-fact among individuals and business entities designed to divert taxpayer money to members of the enterprise; destroy the professional reputation of anyone who seeks to expose the nature and extent of the enterprise through fraud, widespread defamation, and murder; protect the members of the enterprise from civil liability by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; bribing and otherwise incentivizing people associated with those deemed enemies of this enterprise to spread lies about those "enemies;" punishing attorneys who sue members of the enterprise by preventing them from becoming admitted to practice law; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; illegally infiltrating protected computers to spy on the "enemies" of the enterprise, in some cases through fraudulently

obtained search warrants; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

409.    The enterprise has been engaged in activities which affect interstate and foreign commerce.

410.    Each Defendant is distinct from the enterprise itself but each Defendant has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

411.    Defendants engaged in "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

412.    Violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1503 (Obstruction of Federal Court Proceedings), 18 U.S.C. 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises) and Murder are specifically enumerated as "racketeering activity" in Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

413.    **Defendants violated 18 U.S.C. § 1343 (Wire Fraud) as follows:**

a.    Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

b.    In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c.    In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d.    In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

e.    In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

f.    In furtherance of this scheme, as more particularly described above, the Defendants, through the AECOM Fraud, attempted to set up Antonacci for a False Claims Act violation. To that end, the Firmender orchestrated a legally dubious settlement with the Owner on the 395 Express Lanes Project, caused the destruction of relevant documents with litigation imminent and/or pending, and attempted to create a paper trail leading to Antonacci.

g.    When Antonacci withdrew the plea in bar, Firmender, Wiggins, and others made false statements about Antonacci's litigation skills, whereby they willfully and maliciously omitted the fact that Antonacci had to withdraw the plea to avoid becoming complicit in the AECOM Fraud.

h.    In furtherance of this scheme, as more particularly described above, So and Wheeler utilized interstate wires to knowingly, and with intent to defraud,

accessed Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in order to surveil him and monitor his behavior, in violation of 18 U.S.C. § 1830.

i.  Alternatively, So, Wheeler, Storij, and other Defendants utilized interstate wires to provide false, incomplete, and/or misleading information to U.S. government officials in order to obtain illegally a warrant allowing them to do so.

j.  In furtherance of this scheme, as more particularly described above, Defendants transmitted, and caused others to transmit, wire communications in interstate commerce for the purpose of executing this scheme.

414.  **Defendants violated 18 U.S.C. § 1341 (Mail Fraud) as follows:**

a.  Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

b.  In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c.  In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d.  In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from

becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

  e.  In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

  f.  In furtherance of this scheme, as more particularly described above, the Defendants, through the AECOM Fraud, attempted to set up Antonacci for a False Claims Act violation. To that end, the Firmender orchestrated a legally dubious settlement with the Owner on the 395 Express Lanes Project, caused the destruction of relevant documents with litigation imminent and/or pending, and attempted to create a paper trail leading to Antonacci.

  g.  As more particularly described above, Defendants used, and caused others to use, the U.S. mail for the purpose of executing this scheme.

  415. **Defendants violated 18 U.S.C. § 1503 (Obstruction of Justice) as follows:**

  a.  Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the outcome of Antonacci's federal case in Chicago, both at the district court level and in the Seventh Circuit Appeal.

  b.  Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence District Judge Milton Shadur to dismiss *sua sponte* Antonacci's complaint for want of subject matter jurisdiction less than a week after he filed it.

c.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the Seventh Circuit's Clerk's office to inexplicably deny Antonacci electronic filing privileges in an attempt to have his appeal dismissed.

d.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the Seventh Circuit to grant the respondent's motion for a 35-day extension of time to file their brief of appellee – one day after filing – in order to allow the Illinois Appellate Court to issue its opinion 11 days later, such that the appellees could rely on that fraudulent opinion.

e.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence Judge Wood to draft and orchestrate its unfounded and deliberately defamatory opinion.

f.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully utilized Fusion GPS and FTI to spread false narratives about Antonacci to ensure that he received no relief from the federal courts, and to ensure that his SCOTUS petition was denied.

416.    **Defendants violated 18 U.S.C. 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises)**

a.    Defendants traveled throughout the country to perpetuate this racketeering enterprise, including, without imitation:

i. So and Wheeler traveled between New York, California, and Washington, DC numerous times in furtherance of this fraudulent scheme.

ii. Allen Wiggins, Assistant General Counsel for Lane, frequently traveled between North Carolina, Virginia, Connecticut, and Washington, DC in furtherance of this fraudulent scheme.

iii. Leslie Kiernan traveled from Maryland and/or Washington, DC, to Chicago, Illinois, in furtherance of this fraudulent scheme.

iv. Diane Wood traveled from Chicago, Illinois, to Washington, DC, in furtherance of this fraudulent scheme.

v. Lombardo traveled to Maryland to meet with Jose Andres in furtherance of this fraudulent scheme.

417. **Defendants attempted to murder Louis Antonacci as follows:**

a. Utilizing interstate wires, the Defendants either infiltrated Antonacci's mobile device or communicated with his "friends" to discover where Antonacci would be the evening before he was scheduled to fly to Germany.

b. Derran Eaddy went to Royal Restaurant with the intent to kill Antonacci.

c. Derran Eaddy antagonized Antonacci by calling him a "privileged white piece of shit" and then pointing in his pregnant girlfriend's face in a threatening manner.

d. Eaddy was hoping that he would capture Antonacci shouting racial slurs or attacking Eaddy.

e. Eaddy attempted to murder Antonacci when he punched Antonacci in the nose, but Antonacci wrestled Eaddy to the ground before he could harm Antonacci further.

418.   Defendants' multiple violations of 18 USC § 1341, 18 USC § 1343, 18 USC § 1503, and constitute a "pattern" of racketeering activity.

419.   In light of the pattern of racketeering activity more particularly described above, Defendants' enterprise presents a clear threat of continued racketeering activity.

420.   Defendants maintained their interest in this enterprise by means of this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).

421.   Defendants have been directly participating in and conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

422.   The enterprise is separate and distinct from the pattern of racketeering activity.

423.   As a proximate result of these RICO violations, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

424.   Mr. Antonacci is entitled to recover treble damages, and the costs of bringing this action and the Circuit Court Case.

425.   The Defendants acted with gross fraud, wantonness, maliciousness, and willful disregard for Antonacci's rights, and are therefore liable for punitive damages.

426.   The damages Antonacci and his profession are incurring are ongoing.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of $105,000,000, plus punitive damages, attorneys' fees and the costs of this action.

## COUNT II: Violation of Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1962 (d) - RICO Conspiracy)
### (All Defendants)

427.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

428.    The association-in-fact of all Defendants named in this Complaint, together with the others described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

429.    Specifically, the enterprise is an association-in-fact among individuals and business entities designed to divert taxpayer money to members of the enterprise; destroy the professional reputation of anyone who seeks to expose the nature and extent of the enterprise through fraud, widespread defamation, and murder; protect the members of the enterprise from civil liability by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; bribing and otherwise incentivizing people associated with those deemed enemies of this enterprise to spread lies about those "enemies;" punishing attorneys who sue members of the enterprise by preventing them from becoming admitted to practice law; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; illegally infiltrating protected computers to spy on the "enemies" of the enterprise, in some cases through fraudulently obtained search warrants; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

430.   The enterprise has been engaged in activities which affect interstate and foreign commerce.

431.   Each Defendant is distinct from the enterprise itself but each Defendant, together with the others more particularly described above, has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

432.   Violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1503 (Obstruction of Federal Court Proceedings), 18 U.S.C. 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises) and Murder are specifically enumerated as "racketeering activity" in Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

433.   **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Hobbs Act Extortion) as follows:**

a.   Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

b.   Specifically, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to prevent Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c.   In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel utilized wrongful means to achieve wrongful objectives.

d.      In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to resolve the Circuit Court Case.

e.      In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to use wrongful means to achieve a wrongful objective, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful justification.

f.      In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to withdraw the Rule 9.3 Subpoenas.

g.      When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful justification.

h.      Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

i.      Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

434.    **The agreed-upon scheme involves knowing and intentional violations of 720 ILCS 5/12-6 (Illinois Intimidation/Extortion) as follows:**

a.      Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr.

Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

b.      Specifically, Mulaney, Walsh, and Sublett, threatened to prevent, without lawful authority, Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c.      In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to threaten delaying Mr. Antonacci's bar application until the Circuit Court Case was resolved, without lawful authority, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful authority.

d.   In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel threatened to deny his application to the Illinois Bar, without lawful authority, if he did not withdraw the Rule 9.3 Subpoenas.

e.   When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful authority.

f.   Mr. Antonacci subsequently withdrew his Illinois Bar Application before the Hearing Panel could deny it.

g.   Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

h.   Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

435.    **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Activity) as follows:**

a.  Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud, extort, and intimidate Mr. Antonacci.

b.  In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

c.  In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

d.  In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr. Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

e.  In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, used, or caused to be used, the mail and other facilities, including interstate wires, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the scheme to defraud, extort, and intimidate Mr. Antonacci.

80

f.    In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, traveled between New York, California, North Carolina, Illinois, Virginia, Connecticut, Maryland, and Washington, DC numerous times to collaborate with one another and present Antonacci with material misrepresentations of fact and material omissions.

g.    In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, set up Antonacci Law to do business with a front company, Storij, which is organized in Delaware and has its principal place of business in New York, whereby Storij obtained fraudulent U.S. government subcontracts for the sole purposes of gathering intelligence data on Antonacci.

h.    Firmender specifically orchestrated the AECOM Fraud and interstate travel between Connecticut, Virginia, the District of Columbia, and North Carolina in order to damage Antonacci's career.

i.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the outcome of Antonacci's federal case in Chicago, both at the district court level and in the Seventh Circuit Appeal.

436.    The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1503 (Obstruction of Justice), as more particularly described above.

437.    The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1341 (mail fraud), as more particularly described above.

438.    The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1343 (wire fraud), as more particularly described above.

439. Defendants thus conspired to engage in a "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

440. Defendants thus conspired to engage in a pattern of racketeering activity.

441. Defendants thus conspired to violate 18 U.S.C. §§ 1962(b) and (c) in violation of 18 U.S.C. § 1962 (d).

442. Major conspired on behalf of herself and on behalf of Major Law.

443. Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago and this enterprise.

444. Sublett and Asaro conspired on behalf of Neal & Leroy and this enterprise.

445. Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, Ponder, and this enterprise.

446. Kaplan conspired on behalf of himself, Seyfarth, Ponder and this enterprise.

447. Ponder conspired on behalf of herself, Seyfarth, and this enterprise.

448. Arnold conspired on behalf of himself, Sosin & Arnold, Toomey, and this enterprise.

449. Mulaney conspired on behalf of herself and this enterprise.

450. Kruse conspired on behalf of herself, on behalf of Kruse International, and this enterprise.

451. Sandy Toomey and Anderson conspired on behalf of Toomey and this enterprise.

452.    Lombardo conspired on behalf of himself, the Gibsons Restaurant Group and this enterprise.

453.    Firmender conspired on behalf of himself and this enterprise.

454.    FTI conspired on behalf of itself and this enterprise.

455.    Fusion GPS conspired on behalf of itself and this enterprise.

456.    Rokk conspired on behalf of itself and this enterprise.

457.    Derran Eaddy conspired on behalf of himself and this enterprise.

458.    Emanuel conspired on behalf of himself and this enterprise.

459.    Shapiro and Kiernan conspired on behalf of themselves, Holland & Knight, and this enterprise.

460.    Diane Wood conspired on behalf of herself and this enterprise.

461.    So and Wheeler conspired on behalf of themselves, Storij and this enterprise.

462.    As a proximate result of these RICO violations, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

463.    Mr. Antonacci is entitled to recover treble damages, the costs of bringing this action, and his reasonable attorneys' fees.

464.    The Defendants acted with gross fraud, wantonness, maliciousness, and willful disregard for Antonacci's rights, and are therefore liable for punitive damages.

465.    The damages Antonacci and his profession are incurring are ongoing.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of $105,000,000, plus punitive damages, attorneys' fees and

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 99 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 84 of 101 PageID# 84
PageID# 1207

the costs of this action.

## COUNT III: STATUTORY BUSINESS CONSPIRACY
### (VA. CODE (1950) §§ 18.2-499, 18.2-500)
### (All Defendants)

466.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

467.    Defendants combined, agreed, mutually undertook, and concerted together, and with others, to effect preconceived plan and unity of design and purpose.

468.    The purpose of this plan was unlawfully to destroy Antonacci's legal career so that he could not expose the criminal nature of this enterprise.

469.    Shapiro and Kiernan conspired to defame Antonacci to prevent him from taking a senior associate position before they forced him to resign despite his overwhelming success for Holland & Knight and its clients.

470.    Shapiro, Kiernan, and Emanuel conspired to prevent Antonacci from getting another job until he applied for a position with Seyfarth Shaw and Anita Ponder after Emanuel had been elected Mayor of Chicago.

471.    Once he was in Chicago, Defendants conspired to have Ponder baselessly slander Antonacci to firm management, terminate him despite his generating his own business and receiving overwhelmingly positive performance evaluations from everyone but Ponder, and ensure the Ponder Slander Email was in his personnel file so that it would appear that he was incapable of doing his job.

472.    Once he was terminated from Seyfarth, the purpose of the plan was to

    a.    prevent Mr. Antonacci from prosecuting the Circuit Court Case, which is a breach of Major and Major Law's fiduciary duty to Mr. Antonacci;

84

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 100 of 117
Case 1:24-cv-00172    Document 1    Filed 02/09/24    Page 85 of 101 PageID# 85
PageID# 1208

b.      coerce and intimidate Mr. Antonacci into withdrawing the Circuit

Court Case or accepting Seyfarth's initial settlement offer, by delaying his Illinois Bar

Application and putting him on the Blacklist of attorneys disfavored by Cook County

Circuit Court judges such that Mr. Antonacci could not earn a living practicing law in

Chicago, in violation of 720 ILCS 5/12-6 and 18 USC § 1951; and

c.      coerce and intimidate Mr. Antonacci into withdrawing subpoenas

lawfully served in Cook County, such that the Defendants would not have to quash those

subpoenas without authority, in violation of 720 ILCS 5/12-6 and 18 USC § 1951;

473.    Gehringer was and is the architect of this conspiracy. Shortly after Mr.

Antonacci rejected Seyfarth's initial settlement offer, Gerhinger, Seyfarth, Ponder, and

Kaplan conspired with Major to

a.      keep Mr. Antonacci's Verified Complaint under seal so that the

allegations exposing the corruption and incompetence pervading Seyfarth would not

remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b.      file an Amended Complaint that would be far weaker than the

Verified Complaint because it would contain less relevant, factual allegations, and omit

the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr.

Antonacci;

c.      include the Ponder Slander Email as an exhibit to the Amended

Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth

and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied

Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over

Mr. Antonacci's allegations;

d.      unnecessarily delay the proceedings as long as possible, breaching

Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and

interstate communications to conspire with members of the Illinois Board of Bar

Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr.

Antonacci from becoming licensed to practice law in the State of Illinois, which would

damage his professional reputation and prevent him from earning a living, in violation of

720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

e.      deliberately incur unnecessary legal fees such that financial

pressure would force Mr. Antonacci to accept a low settlement, breaching Major's

fiduciary duty to Mr. Antonacci;

f.      if Mr. Antonacci refused to settle his case, then Major would

withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci

into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.      Gehringer agreed to coordinate with Gran, Brewer, and any other

Cook County Circuit Court judges, as necessary, to pass instructions concerning the

Defendants' case strategy, how to rule on particular issues, and how to harass and

intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6,

and 18 USC §§ 1341, 1343, 1951, 1952;

h.      Major agreed to write a letter to Neriem, and Ponder and Gehringer

agreed to conspire with Neriem to coordinate her response such that it could be used to

harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§

1341, 1343, 1951, 1952; and

i.      Gehringer agreed to conspire with others as needed moving forward.

86

474.    Gehringer conspired with Bronstein and Mulaney to have Storino removed from the Inquiry Panel and substituted with Sublett.

475.    Gehringer conspired with Mulaney, Sublett, and Walsh and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

476.    When, on April 23, 2013, Mr. Antonacci requested that the Inquiry Panel disclose any communications with Seyfarth or Ponder relating to Mr. Antonacci, Ponder, Seyfarth, and Gehringer conspired with Mulaney, Walsh, and Sublett and instructed them, utilizing interstate communications and U.S. Mail, to deny Mr. Antonacci's certification to the Illinois Bar on April 24, 2013, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

477.    Gehringer conspired with Bronstein, Fedo, and Asaro to unlawfully quash Mr. Antonacci's Rule 9.3 Subpoenas.

478.    Gehringer conspired with Patton, Nereim, and Dolesh to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

479.    From December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications,

to knowingly conceal the City's evidence of Ponder's fraudulent misconduct, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

480.    Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 18 USC §§ 1341, 1343, 1952.

481.    From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy, in violation of 18 USC §§ 1341, 1343, 1952.

482.    Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. On September 2, 2014, Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, in violation of 18 USC §§ 1341, 1343, 1952.

483.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's federal case in Chicago, both at the district court level and in the Seventh Circuit Appeal, in violation of 18 U.S.C. § 1503.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 104 of 117
Case 1:24-cv-00172    Document    Filed 02/14/24    Page 89 of 101 PageID# 89
PageID# 1212

484.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's SCOTUS Petition, in violation of 18 U.S.C. § 1503.

485.    Defendants conspired with Derran Eaddy to attempt to murder Antonacci and race-bait him.

486.    Defendants, and the others set forth above, conspired with Rokk, FTI, and Fusion GPS to perpetuate a surreptitious defamation campaign against Antonacci, in violation of 18 U.S.C. §§ 1343 and 1341, and Va. Code § 18.2-499.

487.    Firmender conspired with the Defendants and others, as more particularly described above, to orchestrate the AECOM Fraud, in violation of 18 U.S.C. §§ 1343, 1341, and 3729, and Va. Code § 18.2-499.

488.    So, Wheeler, Storij, and other Defendants conspired to knowingly, and with intent to defraud, access Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in violation of 18 U.S.C. § 1830(b).

489.    Alternatively, So, Wheeler, Storij, and other Defendants conspired to provide false, incomplete, and/or misleading information to U.S. government officials in order to obtain illegally a warrant allowing them to do so.

490.    At all times relevant to these proceedings, Antonacci's computer was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

491.    At all times relevant to these proceedings, Antonacci's mobile phone was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

492.    Defendants, and the others more particularly described above, all made this agreement intentionally, purposefully, and without lawful justification.

493.    Defendants, and the others more particularly described above, each undertook acts in furtherance of this conspiracy.

494.    Major conspired on behalf of herself and on behalf of Major Law.

495.    Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago and this enterprise.

496.    Sublett and Asaro conspired on behalf of Neal & Leroy and this enterprise.

497.    Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, Ponder, and this enterprise.

498.    Kaplan conspired on behalf of himself, Seyfarth, Ponder and this enterprise.

499.    Ponder conspired on behalf of herself, Seyfarth, and this enterprise.

500.    Arnold conspired on behalf of himself, Sosin & Arnold, Toomey, and this enterprise.

501.    Mulaney conspired on behalf of herself and this enterprise.

502.    Kruse conspired on behalf of herself, on behalf of Kruse International, and this enterprise.

503.    Sandy Toomey and Anderson conspired on behalf of Toomey and this enterprise.

504.    Lombardo conspired on behalf of himself, the Gibsons Restaurant Group and this enterprise.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 106 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 91 of 101 PageID# 91
PageID# 1214

505. Firmender conspired on behalf of himself and this enterprise.

506. FTI conspired on behalf of itself and this enterprise.

507. Fusion GPS conspired on behalf of itself and this enterprise.

508. Rokk conspired on behalf of itself and this enterprise.

509. Derran Eaddy conspired on behalf of himself and this enterprise.

510. Emanuel conspired on behalf of himself and this enterprise.

511. Shapiro and Kiernan conspired on behalf of themselves and this enterprise.

512. Diane Wood conspired on behalf of herself and this enterprise.

513. So and Wheeler conspired on behalf of themselves, Storj and this enterprise.

514. As set forth above, Defendants willfully and maliciously combined, associated, agreed, mutually undertook and concerted to together to willfully and maliciously injure Antonacci in his reputation, business, and profession.

515. The damage Antonacci and his business are incurring is ongoing.

516. As a proximate result of these violations of Va. Code (1950) § 18.2-499, 18.2-500, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

517. Pursuant to Va. Code § 18.2-500, Mr. Antonacci is entitled to recover treble damages, the costs of bringing this action, and his reasonable attorneys' fees.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 107 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 92 of 101 PageID# 92
PageID# 1215

named Defendants, in the amount of $105,000,000, plus attorneys' fees and the costs of this action.

## COUNT IV: COMMON LAW CIVIL CONSPIRACY
### (All Defendants)

518.    All the preceding paragraphs are incorporated as if fully set forth herein.

519.    Defendants combined, agreed, mutually undertook, and concerted together to effect a preconceived plan of unity of design and purpose.

520.    The purpose of this plan was to destroy Antonacci's legal career so that he could not expose the criminal nature of the enterprise set forth above.

521.    The purpose of this plan was unlawfully to destroy Antonacci's legal career so that he could not expose the criminal nature of this enterprise.

522.    Shapiro and Kiernan conspired to defame Antonacci to prevent him from taking a senior associate position before they forced him to resign despite his overwhelming success for Holland & Knight and its clients.

523.    Shapiro, Kiernan, and Emanuel conspired to prevent Antonacci from getting another job until he applied for a position with Seyfarth Shaw and Anita Ponder after Emanuel had been elected.

524.    Once he was in Chicago, Defendants conspired to have Ponder baselessly slander Antonacci to firm management, terminate him despite his generating his own business and receiving overwhelmingly positive performance evaluations from everyone but Ponder, and ensure the Ponder Slander Email was in his personnel file so that it would appear that he was incapable of doing his job.

525.    Once he was terminated from Seyfarth, the purpose of the plan was to

d.      prevent Mr. Antonacci from prosecuting the Circuit Court Case,

which is a breach of Major and Major Law's fiduciary duty to Mr. Antonacci;

e.      coerce and intimidate Mr. Antonacci into withdrawing the Circuit

Court Case or accepting Seyfarth's initial settlement offer, by delaying his Illinois Bar

Application and putting him on the Blacklist of attorneys disfavored by Cook County

Circuit Court judges such that Mr. Antonacci could not earn a living practicing law in

Chicago, in violation of 720 ILCS 5/12-6 and 18 USC § 1951; and

f.      coerce and intimidate Mr. Antonacci into withdrawing subpoenas

lawfully served in Cook County, such that the Defendants would not have to quash those

subpoenas without authority, in violation of 720 ILCS 5/12-6 and 18 USC § 1951;

526.    Gehringer was and is the architect of this conspiracy. Shortly after Mr.

Antonacci rejected Seyfarth's initial settlement offer, Gerhinger, Seyfarth, Ponder, and

Kaplan conspired with Major to

j.      keep Mr. Antonacci's Verified Complaint under seal so that the

allegations exposing the corruption and incompetence pervading Seyfarth would not

remain public, breaching Major's fiduciary duty to Mr. Antonacci;

k.      file an Amended Complaint that would be far weaker than the

Verified Complaint because it would contain less relevant, factual allegations, and omit

the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr.

Antonacci;

l.      include the Ponder Slander Email as an exhibit to the Amended

Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth

and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 109 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 94 of 101 PageID# 94
PageID# 1217

Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over

Mr. Antonacci's allegations;

m.    unnecessarily delay the proceedings as long as possible, breaching

Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and

interstate communications to conspire with members of the Illinois Board of Bar

Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr.

Antonacci from becoming licensed to practice law in the State of Illinois, which would

damage his professional reputation and prevent him from earning a living, in violation of

720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

n.    deliberately incur unnecessary legal fees such that financial

pressure would force Mr. Antonacci to accept a low settlement, breaching Major's

fiduciary duty to Mr. Antonacci;

o.    if Mr. Antonacci refused to settle his case, then Major would

withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci

into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

p.    Gehringer agreed to coordinate with Gran, Brewer, and any other

Cook County Circuit Court judges, as necessary, to pass instructions concerning the

Defendants' case strategy, how to rule on particular issues, and how to harass and

intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6,

and 18 USC §§ 1341, 1343, 1951, 1952;

q.    Major agreed to write a letter to Neriem, and Ponder and Gehringer

agreed to conspire with Neriem to coordinate her response such that it could be used to

94

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 110 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 95 of 101 PageID# 95
PageID# 1218

harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

   r. Gehringer agreed to conspire with others as needed moving forward.

527. Gehringer conspired with Bronstein and Mulaney to have Storino removed from the Inquiry Panel and substituted with Sublett.

528. Gehringer conspired with Mulaney, Sublett, and Walsh and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

529. When, on April 23, 2013, Mr. Antonacci requested that the Inquiry Panel disclose any communications with Seyfarth or Ponder relating to Mr. Antonacci, Ponder, Seyfarth, and Gehringer conspired with Mulaney, Walsh, and Sublett and instructed them, utilizing interstate communications and U.S. Mail, to deny Mr. Antonacci's certification to the Illinois Bar on April 24, 2013, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

530. Gehringer conspired with Bronstein, Fedo, and Asaro to unlawfully quash Mr. Antonacci's Rule 9.3 Subpoenas.

531. Gehringer conspired with Patton, Nereim, and Dolesh to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 111 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 96 of 101 PageID# 96
PageID# 1219

532. From December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

533. Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 18 USC §§ 1341, 1343, 1952.

534. From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy, in violation of 18 USC §§ 1341, 1343, 1952.

535. Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. On September 2, 2014, Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, in violation of 18 USC §§ 1341, 1343, 1952.

536. Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's federal case in Chicago,

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 112 of 117
Case 1:24-cv-00172   Document 1   Filed 02/24/24   Page 97 of 101 PageID# 97
PageID# 1220

both at the district court level and in the Seventh Circuit Appeal, in violation of 18 U.S.C. § 1503.

537.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's SCOTUS Petition, in violation of 18 U.S.C. § 1503.

538.    Defendants conspired with Derran Eaddy to attempt to murder Antonacci and race-bait him.

539.    Defendants, and the others set forth above, conspired with Rokk, FTI, and Fusion GPS to perpetuate a surreptitious defamation campaign against Antonacci, in violation of 18 U.S.C. §§ 1343 and 1341, and Va. Code § 18.2-499.

540.    Firmender conspired with the Defendants and others, as more particularly described above, to orchestrate the AECOM Fraud, in violation of 18 U.S.C. §§ 1343, 1341, 18 U.S.C. §§ 3729, and Va. Code § 18.2-499.

541.    So, Wheeler, Storij, and other Defendants conspired to knowingly, and with intent to defraud, access Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in violation of 18 U.S.C. § 1830(b).

542.    Alternatively, So, Wheeler, Storij, and other Defendants conspired to provide false, incomplete, and/or misleading information to U.S. government officials in order to obtain illegally a warrant allowing them to do so.

543.    At all times relevant to these proceedings, Antonacci's computer was engaged in interstate and/or foreign commerce, as is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 113 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 98 of 101 PageID# 98
PageID# 1221

544.    At all times relevant to these proceedings, Antonacci's mobile phone was engaged in interstate and/or foreign commerce, as is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

545.    Defendants, and the others more particularly described above, all made this agreement intentionally, purposefully, and without lawful justification.

546.    Defendants, and the others more particularly described above, each undertook acts in furtherance of this conspiracy.

547.    Major conspired on behalf of herself and on behalf of Major Law.

548.    Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago and this criminal enterprise.

549.    Sublett and Asaro conspired on behalf of Neal & Leroy and this criminal enterprise.

550.    Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, Ponder, and this criminal enterprise.

551.    Kaplan conspired on behalf of himself, Seyfarth, Ponder and this criminal enterprise.

552.    Ponder conspired on behalf of herself, Seyfarth, and this criminal enterprise.

553.    Arnold conspired on behalf of himself, Sosin & Arnold, Toomey, and this criminal enterprise.

554.    Mulaney conspired on behalf of herself and this criminal enterprise.

555.    Kruse conspired on behalf of herself, on behalf of Kruse International, and this criminal enterprise.

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 114 of 117
Case 1:24-cv-00172    Document 1    Filed 02/14/24    Page 99 of 101 PageID# 99
PageID# 1222

556.    Sandy Toomey and Anderson conspired on behalf of Toomey and this criminal enterprise.

557.    Lombardo conspired on behalf of himself, the Gibsons Restaurant Group and this criminal enterprise.

558.    Firmender conspired on behalf of himself and this criminal enterprise.

559.    FTI conspired on behalf of itself and this criminal enterprise.

560.    Fusion GPS conspired on behalf of itself and this criminal enterprise.

561.    Rokk conspired on behalf of itself and this criminal enterprise.

562.    Derran Eaddy conspired on behalf of himself and this criminal enterprise.

563.    Emanuel conspired on behalf of himself and this criminal enterprise.

564.    Shapiro and Kiernan conspired on behalf of themselves and this criminal enterprise.

565.    Diane Wood conspired on behalf of herself and this criminal enterprise.

566.    So and Wheeler conspired on behalf of themselves, Storij and this criminal enterprise.

567.    Defendants made this agreement intentionally, purposefully, and without lawful justification.

568.    Defendants each undertook acts in furtherance of this conspiracy.

569.    As a proximate result of this conspiracy, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named

Defendants, in the amount of $35,000,000, plus attorneys' fees and the costs of this action.

## COUNT V: COMPUTER FRAUD AND ABUSE ACT
## (18 U.S.C. § 1030)
### (Storij)

570.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

571.    So and Wheeler, on behalf of Storij, knowingly, and with intent to defraud, accessed Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in violation of 18 U.S.C. § 1830.

572.    At all times relevant to these proceedings, Antonacci's computer was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

573.    At all times relevant to these proceedings, Antonacci's mobile phone was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

574.    Antonacci has suffered economic damage as a result of Storij's intentional violations of 18 U.S.C. § 1030, including lost profits, in an amount to be proven at trial.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against Storij, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial.

**A JURY TRIAL IS DEMANDED.**

Case 1:24-cv-00172-MSN-LRV   Document 91-2   Filed 04/10/24   Page 116 of 117
Case 1:24-cv-00172   Document 1   Filed 02/14/24   Page 101 of 101 PageID# 101
PageID# 1224

Dated: February 14, 2024 ♥

Respectfully submitted,


_____/s/_____

Louis B. Antonacci
VSB No. 75840
**ANTONACCI PLLC**
501 Holland Lane, Unit 107
Alexandria, VA 22314
lou@antonaccilaw.com
T 703-300-4635

101

Case 1:24-cv-00172-MSN-LRV    Document 91-2    Filed 04/10/24    Page 117 of 117
Case 1:24-cv-00172   Document 13   Filed 02/14/24   Page 1 of 353 PageID# 104
PageID# 1225

# EXHIBIT A